STATE BOARD OF TAX APPEALS.

CITY OF JERSEY CITY, PETITIONER, v. J. H. THAYER MARTIN, STATE TAX COMMISSIONER, AND LEHIGH VALLEY RAILROAD COMPANY, CENTRAL RAILROAD COMPANY OF NEW JERSEY, NEW YORK CENTRAL RAILROAD COMPANY, DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY, ERIE RAILROAD COMPANY, NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY AND PENNSYLVANIA RAILROAD COMPANY, RESPONDENTS.

Decided May 26, 1942.

For the City of Jersey City, *James A. Hamill* (by *Frank P. McCarthy*).

For the State Tax Commissioner, *David T. Wilentz,* Attorney-General (by *Duane E. Minard, Charles V. Webb, Jr.,* and *Duane E. Minard, Jr.*).

For the respondent railroad companies, *Maximilian M. Stallman* and *Robert J. Bain.*

QUINN, President. The appeals designated by the foregoing caption are in the nature of cross-appeals to the petitions of appeal filed by the railroad companies referred to, and others, for the reduction of the assessed valuations fixed by the State Tax Commissioner upon railroad property of all classes, for the year 1939. The city appeals are disposed of herewith. These latter are of course limited to the waterfront railroad terminal properties situated in that taxing district, described as "second class" property under the Railroad Tax Act (*R. S.* 54:22-1; *N. J. S. A.* 54:22-1), in which the city has a peculiar interest, since for the tax year in question such property was taxed at the local rate of taxation certified for

the taxing district by the Hudson County Board of Taxation (*R. S.* 54:22-10; *N. J. S. A.* 54:22-10), and the entire amount of the tax derived from such property in the city was allotted and directed to be paid over to it. *R. S.* 54:24-11; *N. J. S. A.* 54:24-11.

The particular properties under review in these appeals are the lands and the railroad structures upon them, constituting classification terminals and waterfront rail float and lighterage facilities, known as the Pennsylvania Railroad Terminal, the Claremont Terminal of the Lehigh Valley Railroad, the Black Tom Terminal of the Lehigh Valley Railroad, the Central Railroad of New Jersey Terminal, the Pennsylvania Railroad Harsimus Coal Terminal, the Erie Railroad Terminal and part of the Delaware. Lackawanna and Western Terminal. It appears that the State Tax Department, for the year 1939, made primary valuations for second class lands and structures, in accordance with its practice of past years, *i. e.,* by the deduction of retired or dismantled structures, the addition of new structures reported by the railroads, and the carrying forward of the valuations of prior years for lands and unimproved structures. It further appears that the Commissioner then made final assessment valuations for the year 1939, by reducing all of the said primary land valuations upon second-class property, horizontally, by 10%, and all of the said valuations upon structures, uniformly, by 7½%. The gravamen of the Jersey City appeals is that the reductions of both land and structures assessments were arbitrary and unjustifiable, and result in a decrease of the valuations below the true value of the several properties in question. It may be noted that the most recent previous change in second-class land valuations took place in 1936, when there was a similar 10% reduction, to which, however, none of the taxing districts affected took exception by filing appeals.

The action of the State Tax Commissioner, as the assessor, is entitled to the presumption of correctness, *United New Jersey Railroad and Canal Co.* v. *State Board of Taxes and Assessment (Supreme Court, 1926),* 103 *N. J. L.* 33; 134 *Atl. Rep.* 669, and the problem before us accordingly is as to whether the exhaustive proofs and full arguments upon the

law and the facts submitted on behalf of the city do not sustain the burden it carries, and establish the incorrectness of the action of the Commissioner. Upon thorough consideration of the whole case, we have concluded that they do.

In performing his duties under the Railroad Tax Statutes, *R. S.* 54:19-1, *et seq.; N. J. S. A.* 54:19-1, *et seq.,* the State Tax Commissioner is particularly directed, in reference to second-class property, to ascertain the "value * * * *in each taxing district* in this state, including * * * waterways, reservoirs, tracks, buildings, water tanks, waterworks, riparian rights, docks, wharves, and piers, and all other real estate, except lands not used for railroad or canal purposes." *R. S.* 54:22-1; *N. J. S. A.* 54:22-1. For the purpose of aiding in the making of such valuations, each taxpayer company is directed to return annually to the commissioner a statement showing, *inter alia,* the number, character, and value of all buildings and structures in each county and taxing district. *R. S.* 54:23-1; *N. J. S. A.* 54:23-1. From these provisions, as well as from the entire statutory scheme for the assessment and distribution of taxes upon railroad property, it is clear that a separate and independent annual evaluation is to be made of each parcel of land and of each structure assessed as second class railroad property. It is thus an obvious corollary that a horizontal percentage reduction in all railroad structures, of whatever condition, age, degree of usefulness, or location, and without any inspection to determine the existence of variables in these respects, is in violation of the statute. Of similar effect, in principle, is a uniform reduction in all waterfront lands, although under conceivable showings of fact, *relatively* uniform changes in all railroad waterfront property might be justified. The proofs referred to hereinafter will show no such justification in fact as to either structures or land. And concerning the land, no justifiable or reasonable distinction will be seen to have been advanced for the reduction of the highly essential waterfront terminal properties, in contrast to the untouched main-stem lands (Class I property) throughout the state.

A further consideration which must influence the determinations of the board in this matter, in respect to the tax

department's reductions of assessments of the property involved herein, is the fact that the board has decided, in the appeals of the railroad companies for reductions in the valuations fixed by the Commissioner upon all classes of railroad property, including the second-class properties here under review, for the years 1937 and 1938, that such assessments were not in any instance in excess of true values. *The Central Railroad of New Jersey et al.* v. *Martin (State Board,* 1941), 19 *N. J. Mis. R.* 427; 20 *Atl. Rep. (2d)* 330. No appeal having been filed by the companies from the judgments of the board in those cases, the valuations there affirmed, while not *res judicata* in the case *sub judice,* naturally carry a strongly persuasive influence and evoke an inquiry as to what, if anything, has been here adduced to indicate such a difference in the condition of the properties between the assessing dates in the prior cases, January 1st, 1936, and January 1st, 1937, and that applicable in the present case, January 1st, 1938, as would explain or warrant the over-all reductions made for 1939. (See *City of Hoboken* v. *Morris and Essex Railroad Co. (State Board,* 1941), 19 *N. J. Mis. R.* 100; 17 *Atl. Rep. (2d)* 605.) Our search of the record herein discloses no such evidence, but on the contrary indicates affirmatively that there was no basis whatever for downward revisions in 1939. Upon examination by counsel for petitioners as to how the reduction of 10% had been determined as to a specific parcel of waterfront land, Mr. Louis Focht, chief engineer in charge of railroad assessments for the Commissioner, stated: "Simply because we felt that the time had arrived when a reduction should be made." Why the reduction was to the extent of 10%, and that uniformly upon all railroad waterfront, *but not at all as to railroad lands other than waterfront,* was not indicated. With respect to the universal reduction of 7½% upon all structures, this was explained by the witness as due to "functional depreciation," by which term he intended to connote loss of business by the railroads.

Reference to the testimony given by the witness, Focht, in the 1937-1938 cases, in which the valuations of the same second-class properties as are here involved were sustained as

not in excess of true value, indicates that the State Tax Department did accord the factors of functional depreciation and of prior loss of business and earnings, some weight in the fixing of the valuations for those years. The department does not now contend that insufficient allowance for such factors was made in the 1937 and 1938 assessments, and the contentions of the railroad companies to that effect were specifically overruled by the board, in reliance upon the determinations of all the courts in prior cases, as applied to the voluminous proofs adduced in those cases. A tabulation of tonnage and revenue figures of the major railroad systems for the year 1935, 1936 and 1937, will indicate that the Commissioner could not fairly have relied upon any supposed decrease in 1937 (applicable to the tax year 1939) from the years 1935 and 1936 (applicable to the tax years 1937 and 1938), in substantiation of the "loss of business," to which the 7½% cut in structure valuations from 1938 to 1939 were ascribed by Mr. Focht. We offer these figures only for the purpose indicated, and are not to be taken as endorsing the view that variations of an entire railroad system in tonnage or revenues in one year or even over a longer period, are indicative of comparable variations in the valuations of the realty at the most vital and important terminals of such system.

### Reading Company

|  | 1935 | 1936 | 1937 |
|---|---|---|---|
| Freight tonnage .. | 45,468,359 | 52,493,387 | 55,863,566 |
| Operating revenue, | $51,373,733 | $59,291,758 | $58,754,351 |

### The Delaware, Lackawanna and Western Railroad Co.

| Freight tonnage .. | 18,569,680 | 21,307,721 | 22,064,257 |
|---|---|---|---|
| Operating revenue, | $44,722,233 | $49,728,116 | $50,175,004 |

### Erie Railroad Company

| Freight tonnage .. | 30,597,074 | 33,559,349 | 34,786,119 |
|---|---|---|---|
| Operating revenue, | $66,125,406 | $73,937,442 | $72,948,019 |

### New York Central Railroad Company

| Freight tonnage .. | 104,482,468 | 125,948,268 | 131,549,445 |
|---|---|---|---|
| Operating revenue, | $310,192,980 | $361,063,872 | $366,226,126 |

*Central Railroad Company of New Jersey*

Freight tonnage .     22,868,995     25,375,155     27,227,609
Operating revenue,   $28,859,339   $31,073,680   $31,816,691

*Lehigh Valley Railroad Company*

Freight tonnage          . . . .           .          23,604,007
Operating revenue,   $40,641,557   $49,156,379   $48,618,849

With specific reference to the 10% decrease in the land assessments of these terminal properties, in the face of the maintenance of the prior years' assessments of main-stem land values, Mr. Focht recognizes the fact to be, and this is conceded by the railroad companies in their brief, that while system tonnage and earnings figures suffered marked trends of variation, principally downward, in the ten-year period preceding the assessing date for the year 1939, the proportion of the system business which utilizes the Jersey City terminal and transfer facilities has remained fairly constant. Testimony adduced on behalf of petitioner explains the relative constancy of the traffic which is handled by the Jersey City terminals, in that a great quantity of consumer's goods, such as fruits, vegetables, food stuffs and general consumer's merchandise, destined for delivery to the general public in the great metropolitan area, goes through the terminals daily, unaffected by economic conditions affecting the quantity of mined and manufactured products carried by the systems generally.

The unique character and invaluable nature of the waterfront railroad property under appeal would seem to be obvious, in view of the fact that without them most of the major railroad systems serving the Port of New York would be irremediably severed from their most valuable source of business. The New York Custom District handles about one-half of the imports of the entire country and 37% of the exports. For both imports and exports, the terminals here under review constitute an irreplaceable link with the interior of the country. The total tonnage handled by all of the railroads from the New Jersey waterfront for the year 1938 was 3,597,223 tons, 91% of which was handled through the Jersey City

terminals. For the same year the railroads handled 4,561,866 tons of freight by lighterage, 57% of which was handled through these facilities. Lighterage is clearly shown, through the testimony of John J. Mantell, adduced on behalf of the City of Jersey City, to be absolutely essential for the transfer of eastbound, rail-carried, freight to the ocean-going and coastwise vessels which dock at the New York City ports. The steamship piers in New York, built narrow so as to crowd maximum wharfage space into the limited riverfront area, are seriously deficient in pier floor space. This lack is made up by railroad lighterage piers in Jersey City, and by the extensive classification yards upland of the waterfront, where freight bulk can' be broken, sorted, reassembled, and classified for transfer by float to shipside. All of these essential facilities are found in the property under appeal, and are of course invaluable to the railroads owning them.

, In view of the foregoing, it is understandable that there are no expert witnesses available who can qualify their opinions as to the true value of these unique properties by reference to sales of such property, in railroad use, to buyers proposing to continue such use. There have been no such sales. These lands are subject to assessment at their true or market value, in the condition and under the particular use in which they were actually held by their owners, *i. e.*, as railroad terminals. *Trustees of Stevens Institute* v. *State Board* (*Supreme Court,* 1928), 105 *N. J. L.* 99. Seeking to substantiate their respective views as to the true value of these properties, the city and the railorads have done the best that could be done under the circumstances, in adducing the testimony of those men generally conceded to be the most highly qualified authorities on the valuation of waterfront and industrial real estate in Hudson County. Lacking actual sales of such properties as criteria, these witnesses have arrived at valuations based upon hypothetical sales. Only the witness, Coffin, has sold any land in railroad use, and he has also negotiated leases of railroad property. The results arrived at, compared with the primary and final assessment figures determined by the State Tax Department, involving thirty-three parcels of land, varying from .047 to 252 acres in area, are as follows:

| | |
|---|---:|
| S. T. D. Primary Valuations | $76,342,331 |
| S. T. D. Final Valuations | 68,708,099 |
| Experts for Jersey City— | |
| Coffin | 102,656,372 |
| Daly | 101,580,520 |
| Makray | 98,389,800 |
| Experts for Railroad Companies— | |
| Ryer | 38,557,853 |
| Morrison | 38,745,294 |
| Stack | 43,642,202 |

These figures require no comment; neither do they furnish the board any light upon the difficult subject at hand. So far as the valuations of the railroad experts are concerned, they purport to reflect a supposed downward trend of all waterfront land values, based upon sales of property out of the Jersey City area. Such sales are no criteria, however, since not of lands comparable in any sense with those under appeal. We can only conclude that, upon the whole case, the valuations approved by us in the 1937-1938 cases, roughly corresponding with the "primary valuations" set forth above, were not properly subject to the downward revision of 10%, made by the department for the year 1939, in the light of anything shown in the records either of the prior appeals or of this one, or of the long standing knowledge of the board concerning these properties. We find such values were not in excess of the true value of these lands as of January 1st, 1938, and that their reduction, to the injury of the petitioner taxing district, for the year 1939, was erroneous.

With respect to structures, petitioner has offered full proofs of value, through two civil engineers, of each of the separate structures under appeal, numbering forty for the Delaware, Lackawanna and Western Railroad Co., thirty-four for the Lehigh Valley Railroad Co., three for the New York Central Railroad Company, forty for the Pennsylvania Railroad, fifty-eight for the Central Railroad Company of New Jersey, and twenty-six for the Erie Railroad. These structures, of every variety of railroad and terminal use, comprise ferry slips, bridges, piers, storehouses, powerhouses, sidings, passenger

stations, service buildings, water pipe lines, machine shops, roundhouses, freight houses, trestle and other sidings, coal-trestles and pockets, coaling stations, freight transfer bridges, platforms, inspection pits, turntables, retaining walls, warehouses, heating plants, pump houses, grain elevators, and many other types of miscellaneous structures. Petitioner's experts determined their valuations upon the basis of estimated reconstruction cost, less depreciation, and arrived at the following totals, as contrasted with the primary and final assessment totals of the State Tax Department:

|  | Petitioner's Expert | S. T.D. Primary | S. T. D. Assessed |
|---|---|---|---|
| D., L. & W. R. R. | $9,063,660 | $4,812,006 | $4,342,898 |
| Lehigh Valley | 3,266,969 | 2,470,325 | 2,285,053 |
| New York Central | 84,241 | 63,815 | 53,948 |
| Pennsylvania R. R. | 10,548,388 | 6,323,782 | 5,844,638 |
| C. R. R. of N. J. | 10,114,202 | 7,588,123 | 7,005,391 |
| Erie R. R. | 7,486,964 | 4,430,512 | 4,098,224 |

While it has frequently been held that the true market value of buildings or improvements cannot ordinarily be persuasively established by the valuation method of depreciated reproduction cost, *Central Railroad Co.* v. *State Board* (*Supreme Court,* 1886), 49 *N. J. L.* 1; *Turnley* v. *Elizabeth,* (*Supreme Court,* 1908), 76 *Id.* 42; 68 *Atl. Rep.* 1094; *Schetty* v. *City of Jersey City* (*State Board,* 1940), 18 *N. J. Mis. R.* 37; 11 *Atl. Rep.* (2*d*) 18; yet we have recently had occasion to hold that where structures of unique character, not commonly sold in the real estate market and having peculiar value to their owner because of the use being made of them, are involved, as is the case here, resort to consideration of the physical constituents of the structures and their cost, may be justified. *City of Jersey City* v. *Seaboard Terminal and Refrigeration Co.* (*State Board,* 1941), 19 *N. J. Mis. R.* 178 (*certiorari* denied by the Supreme Court). While such proofs are not at all conclusive, in view of the serious question as to whether many of these structures would be reproduced as such if required to be replaced to-day, yet they

are strongly probative of the peculiar value of these particular structures to the railroad companies owning them, if accurate in estimating reproduction costs, since they were actually and effectively serving the present needs of the companies as of the assessing date.

The respondent railroads attack the accuracy, methods, and qualifications of the petitioner's experts, but offer no proof whatever in rebuttal of the estimates of the former as to costs. Some of the companies have adduced testimony as to percentage of depreciation of some of the structures, while others have offered no proofs whatsoever. None of them have attempted to give this board the benefit of their own undoubtedly easily accessible cost figures. We can only suspect that such proofs are withheld because they would not derogate from the soundness of the estimates made by the city's witnesses. Counsel for the City of Jersey City has developed the interesting fact that for an indefinite number of years past, the statutory return of information as to all of the structures of each railroad company has not been supplied by the companies to the Commissioner; that since 1911 there has never been a full and exhaustive inspection by the department of all structures; that the only information upon which the department bases its assessments of structures newly built or improved by the railroads, is that furnished by the companies themselves, consisting of a cost or value new, not independently rechecked by the department, and a proposed assessment figure for the structure, substantially reduced from the cost new figures which they submit. It is clearly established that the State Tax Department has uniformly accepted and applied the cost new figures submitted by the companies, and has also, for the first tax year after such report, assessed the structures upon the basis of an immediate allowance for depreciation of twenty to thirty per cent. Furthermore, counsel have proven that in numerous instances the cost new figures submitted by the companies to the Commissioner have been substantially less than the figures for such costs of the same structure, and for the same year, reported to the Interstate Commerce Commission. An edifying instance in point is the report by the Delaware, Lackawanna and Western Rail-

road Company of its freight terminal, reported in 1930 to the Interstate Commerce Commission at a *value new* of $5,423,434.85, but to the State Tax Commissioner for the same year, at a *value new* of $1,200,000. The concrete viaduct over Henderson Street, south of the said freight terminal, was reported to the Interstate Commerce Commission at a *cost new* of $353,077.50, but not to the State Tax Department at all. The concrete viaduct north of the terminal was reported at a *cost new*, to the Interstate Commerce Commission, of $647,755.50, but to the State Tax Department, for the same year, at a *cost new* of $105,200. Many other such instances of variations in cost new are shown in schedules introduced into evidence by the city, with respect to the other railroad companies, as well as to the one referred to. The same general practice of reliance almost exclusively upon reports of the companies has prevailed with respect to assessments upon structures after major repairs.

Proofs of the type here referred to fortify the conclusions which we arrived at in our determination of the appeals of the railroads in the 1937-1938 cases, to wit, that these second-class structures were not overvalued by the State Tax Commissioner for those years. They lead to the further conclusion here that a reduction in such valuations to the extent of 7½% for the year 1939, or to any extent, was not justified. They establish that the separate and individual annual appraisal and assessment of each of these structures, enjoined upon the Commissioner by the statute, has not taken place, and that therefore the department could not soundly determine that there occurred a 7½% decline in the true value of all these structures, between January 1st, 1937, and January 1st, 1938, so as to justify a reduction to that extent, of the values approved by us in the 1937-1938 cases.

We are not to be understood as criticizing the assessment methodology of the Tax Department generally, nor as indicating that any other approach to the problems of the department could be indulged, as a practical matter, with the means and facilities at hand for the performance of its duties. But nothing could justify us, as the statutory reviewing tribunal, in approving an assessing technique which in the present case,

if not reversed, would deprive the taxing districts in which second-class lands and structures are situated, of the full measure of the taxes due from the railroad companies and to which they are entitled, under the clear and explicit provisions of the Railroad Tax Statute.

We must accordingly determine that the assessments both for lands and structures determined by the State Tax Commissioner for the year 1939, be set aside, and that the primary values fixed by him before calculation of the reductions of 10% upon lands, and 7½% upon structures, be fixed as the assessments thereon for said year.

Judgments accordingly.