**Application of STATE OF NEW JERSEY.**
**In re CENTRAL R. CO. OF NEW JERSEY.**

**Nos. 8861, 8889.**

Circuit Court of Appeals, Third Circuit.

Argued June 20, 1945.

Decided Nov. 15, 1945.

Benjamin C. VanTine, of Trenton, N. J. (Walter D. Van Riper, Atty. Gen. of New Jersey, and Milton B. Conford, of Newark, N. J., on the brief), for the State of New Jersey.

Shelton Pitney, of Newark, N. J., for Trustees of Debtor.

Thomas Racburn White, of Philadelphia, Pa. (A. M. Lewis and Frank H. Heiss, both of New York City, Reynier J. Wortendyke, Jr., of Newark, N.J., Rathbone, Perry, Kelley & Drye, of New York City, Autenreith & Wortendyke, of Newark, N. J., William A. Roberts, Edgar Turlington, and Roberts & McInnis, all of Washington, D. C., Fred N. Oliver, Willard P. Scott, and Carl V. Venters, all of New York City, Blair Reiley, of Newark, N. J., Oliver & Donnally, of New York City, Martin & Reiley, of Newark, N. J., Edwin M. Slote, of New York City, and White & Williams, of Philadelphia, Pa., on the brief), amici curiae.

Before GOODRICH, FRANK, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

These matters have to do with taxes allegedly due and owing the State of New Jersey from the Central Railroad Company. As such, they are a part of a long line of litigation which has for several years occupied the Federal Courts and both the judicial and other branches of the State Government.[1]

In order to better understand the present matter it might be well to outline what has gone before.

### (A) The State Litigation.

In regard to its assessment for the year 1931, the Company complained to the State Board of Tax Appeals as to certain valuations and assessments "because the average rate of taxation for the year 1931 of prosecutor's property is thereby higher than it should be." The Board dismissed the complaint. The Company thereupon appealed to the New Jersey Supreme Court, which refused to disturb the assessment as it stood. The New Jersey Court

---

[1] See Central Railroad Company of New Jersey v. State Board of Tax Appeals, Sup. 1932, 109 N.J.L. 395, 162 A. 889; Central Railroad Company of New Jersey v. State Tax Department, Err. & App.1933, 112 N.J.L. 5, 169 A. 489, certiorari denied Central R. Co. of New Jersey v. State Tax Commission, 293 U.S. 568, 55 S.Ct. 79, 79 L.Ed. 667; N.J.Tax Reports, 1912–1934, page 680; N.J.Tax Reports, 1912–1934, page 675; Central R. Co. v. Thayer-Martin, 114 N.J.L. 69, 175 A. 637; Lehigh Valley R. Co. v. Martin, D.C.1936, 19 F. Supp. 63; Id., 3 Cir., 1938, 100 F.2d 139, certiorari denied 306 U.S. 651, 59 S.Ct. 593, 592, 83 L.Ed. 1049, rehearing denied 306 U.S. 669, 59 S.Ct. 784, 83 L.Ed. 1063; N.J.Tax Reports, 1934–1939, page 82; N.J.Tax Reports, 1934–1939, page 233; Central R. Co. v. Martin, D.C.1939, 30 F. Supp. 41, reversed 3 Cir., 1940, 115 F.2d 968, certiorari denied Lehigh Valley R. Co. v. Martin, 313 U.S. 568, 61 S.Ct. 943, 85 L.Ed. 1527; Central R. Co. v. Martin, 20 A.2d 330, 19 N.J.Misc. 427; Jersey City v. Martin, 26 A.2d 733, 20 N.J.Misc. 283; In re Central R. Co., 3 Cir., 1943, 136 F.2d 633.

of Errors and Appeals unanimously affirmed that judgment.

The Company appealed the assessment for the year 1932 to the State Board of Tax Appeals, which, after hearing, affirmed the assessment. There was no attempt to have the judgment reviewed.

The Company also appealed the 1933 assessment to the State Board of Tax Appeals. The Board, after hearing, affirmed the assessment. An appeal was taken to the Supreme Court, which sustained the Board, holding that the method of assessment was legal and that the Company had not been wronged thereby. Central R. Co. v. Thayer-Martin, 114 N.J. L. 69, 175 A. 637.

The Company appealed the assessments for the years 1934, 1935 and 1936 to the State Board of Tax Appeals urging that: (a) The properties were assessed in excess of their true value; (b) the method of valuing was erroneous and improper; and (c) the assessment of railroad property was discriminatory. The Board, after reviewing extensive evidence as to the above, affirmed the assessments for all three years. There was no appeal from those judgments.

The Company appealed the assessments for the years 1937 and 1938 to the State Board of Tax Appeals. On that appeal, in addition to numerous other points, the Company urged: (a) Deprivation of property without due process of law, in violation of the Fourteenth Amendment to the Federal Constitution: (b) A denial of equal protection of the laws in violation of Article IV, Section 7, Paragraph 12 of the New Jersey Constitution; (c) a denial of equal protection of the laws in violation of the Fourteenth Amendment to the Federal Constitution; (d) a burden upon interstate commerce in violation of Article I, Section 8, of the Federal Constitution. After a lengthy hearing involving some 4600 pages of testimony and 450 exhibits the Board affirmed the assessments. There was no appeal from that decision.

The State Tax Commissioner, after making the 1939 assessments, revised them downward. The City of Jersey City appealed to the State Board of Tax Appeals, which, after a hearing at which the Company, the State and the City of Jersey City adduced testimony, restored the original valuations. Jersey City v. Martin, 26 A.2d 733, 20 N.J.Misc. 283. No review of that judgment was sought in the State Courts. As will be mentioned, infra, however, the Bankruptcy Court later set aside the judgment in its Order No. 171; this latter order was itself set aside by the Third Circuit Court of Appeals as reported in 1943, 136 F.2d 633.

(B) The Federal Litigation Preceding Bankruptcy.

The Company petitioned the United States District Court for the District of New Jersey for a permanent injunction restraining the collection of taxes assessed against it for the years 1932 and 1933. In its petition the Company alleged a denial of due process of law, denial of equal protection of the laws and subjection of interstate commerce to an undue burden. The District Court held that the charges were not established by the evidence and denied the relief sought. Lehigh Valley R. Co. v. Martin, 1936, 19 F.Supp. 63 (opinion by Judge Forman). The Company appealed to the Circuit Court of Appeals for the Third Circuit which affirmed the judgment of the District Court. 100 F.2d 139 (opinion by Judge Biggs). The Court held, inter alia, that the evidence had not supported the Company's allegations and that the question of violation of Federal Constitutional guarantees was res adjudicata, having been decided by the New Jersey Supreme Court in 1933 in the case of Central Railroad Co. v. Thayer-Martin, 114 N.J.L. 69, 175 A. 637, supra. The United States Supreme Court denied certiorari. Central R. Co. of New Jersey v. Martin, 306 U.S. 651, 59 S.Ct. 592, 83 L.Ed. 1049, rehearing denied 1939, 306 U.S. 670, 59 S.Ct. 785, 83 L.Ed. 1063.

The Company again brought suit in the Federal District Court seeking an injunction against the collection of the taxes as assessed for 1934, 1935 and 1936. The District Court sustained most of the Company's contentions and issued an injunction prohibiting the State from collecting more than 60% of these taxes until the property in question should be re-valuated in a manner consistent with the opinion of the District Court. Central R. Co. v. Martin, 30 F.Supp. 41 (Opinion by Judge Forman). The injunction was later modified to 70%. The Circuit Court of Appeals reversed that judgment. 115 F.2d 968 (opinion by Judge Maris). The Court held that the evidence did not establish

the contentions of the Company and that the question of the validity of New Jersey's method of taxing railroad property was res adjudicata by virtue of Central Railroad Co. v. Thayer-Martin, 114 N.J.L. 69, 175 A. 637, supra.

### (C) Federal Litigation after Bankruptcy.

On October 30, 1939, the Central Railroad Company filed its petition under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Company then owed balances on its taxes for the years 1932 to 1939 inclusive. The Comptroller of New Jersey filed proofs of claim for those taxes with the Bankruptcy Court, and, notwithstanding the decisions of this Court adverse to the Company as reported in Lehigh Valley R. Co. v. Martin, 3 Cir., 100 F.2d 139, certiorari denied 306 U.S. 651, 59 S.Ct. 592, 83 L.Ed. 1049, and Central R. Co. v. Martin, 3 Cir., 115 F.2d 968, certiorari denied Lehigh Valley R. Co. v. Martin, 313 U.S. 568, 61 S.Ct. 943, 85 L. Ed. 1527, the Trustees of the Debtor once again raised the same issues as to the same years, before the Bankruptcy Court.

Meanwhile, the New Jersey Legislature passed the so-called Settlement Acts, which sought to forgive the railroads part of their indebtedness to the State. These Acts were contested by the Attorney General of New Jersey and declared unconstitutional by the New Jersey Chancery Court, Wilentz v. Hendrickson, 133 N.J. Eq. 447, 33 A.2d 366, affirmed by the Court of Errors and Appeals, 135 N.J.Eq. 244, 38 A.2d 199. While this litigation was pending the Bankruptcy Court issued its Order No. 163, fixing the amount due the State from the Debtor as the amount fixed in the Settlement Acts. On appeal to this Court, Order No. 163 was set aside. In re Central Railroad Co., 3 Cir., 136 F.2d 633 (opinion by Judge Maris).

On August 12, 1944, following the decision of the New Jersey Court of Errors and Appeals declaring the Settlement Acts unconstitutional, the Trustees petitioned the Bankruptcy Court to adjudicate "the relative rights, claims, liens and priorities" in the assets of the Debtor. The State, through its Attorney General, appeared specially and moved for the dismissal of the petition "insofar as the liens of the State for taxes and interest are sought in anywise to be altered, affected, modified or destroyed," contending that the Bankruptcy Court was without jurisdiction, in the premises, to bind the State in that matter. The Bankruptcy Court refused to pass on this jurisdictional question, referring it, together with the matters which had already been extensively litigated as outlined above, to a Special Master. The Court did this in its Order No. 250, from which an appeal is pending in this Court.

The Special Master started hearings on December 19, 1944. The Master did not seem to be disposed to hear argument on the jurisdictional question but upon protest by the State he did so. Upon conclusion of the argument he stated that he would proceed the following day with a hearing on the merits, before he decided the jurisdictional matter. On January 17, 1945 he filed an interim report, stating that the Bankruptcy Court is "the proper Court to determine the validity and amount of the tax claims of the State of New Jersey and the incidental liens alleged to affect the property in the custody of the Court." The State thereupon protested that the Master had not squarely met its objections to the jurisdiction of the Bankruptcy Court. On February 7, 1945 the State requested a decision on this matter from the District Judge. Notice was then given that the hearing would proceed before the Master; the State again protested that no hearing should be had on the merits until the District Judge had decided the question of jurisdiction. On February 20th these arguments were made to Judge Fake and the next day the Judge informed the State that he had determined he did have jurisdiction. He made a finding confirming the Master's interim report.

The State thereupon petitioned this Court, praying for a writ of prohibition forbidding the Bankruptcy Court from making any adjudication in connection with the tax liens of the State that was intended to be binding on the State. That petition is one of the matters now before us. In the meantime, the District Court, again over the strenuous objections of the State, issued its Order No. 271 confirming the Master's Report. The State has appealed from Order No. 271 and that appeal is also before us.

The problem confronting us is substantially: Whether a District Court, in the course of its general supervision of a Section 77 Debtor, can make an adjudica-

tion concerning the validity of tax liens which had attached to the property of the Debtor prior to the filing of the petition in Bankruptcy, when those assessments upon which the liens are based have previously been held valid upon appeal by the taxing authority of a State and when the highest Court of the State and the United States Circuit Court of Appeals have previously held the method of assessing those taxes to be legal and valid, and

If the above question is answered in the affirmative, what limitations exist upon the power of the Bankruptcy Court to so adjudicate.

### Analysis of New Jersey's Method of Taxing Railroad Property During the Taxable Years.

#### (1) Method of Assessing the Taxable Property.

The laws of New Jersey in effect during the taxable years in the instant case provided substantially as follows:

Throughout our discussion of the New Jersey taxing machinery reference is made to statutes, some of which represent amendments made as late as 1933. Although these amendments were made later than the first taxable year, 1932, it is not deemed necessary to note the changes from the former law, since in every case the rights of the taxpayer on the one hand and the duties of the taxing authorities on the other, were substantially the same throughout the taxable period.

The Statutes of New Jersey provided that all the property of a railroad not used for railroad purposes should be assessed and taxed by the same assessors, in the same manner and at the same rate as the taxable property of other owners in the same taxing district.[2] All property of a railroad used for railroad purposes was to be assessed and taxed by the State Tax Commissioner.[3] It was provided that the State Tax Commissioner should sit at the State Capitol on the Tuesday of March in each year and as often during the year and at such places as his duties should require for the purpose of ascertaining the true value, as of the first day of January preceding, of all the property of each rail-

road used for railroad purposes in the State, including its franchises.[4] The Commissioner was required to ascertain: (1) The length and value of the main stem in each taxing district; (II) The value of the other real estate used for railroad purposes in each taxing district in the state, including the roadbed (other than the main stem), tracks, buildings and all other real estate except lands not used for railroad purposes; (III) The value of all the tangible personal property of each railroad company, and (IV) The value of the remaining property, including the franchise. He was required to complete these valuations by the first day of November following, and on or before December tenth next following he was required to serve upon the treasurer of each railroad company or leave at his office a statement of the assessed valuation of the property of such company in the state and of the separate valuation of the property of such company in each taxing district.[5] The assessors of all taxing districts where property of a railroad not used for railroad purposes should be assessed, if required to do so by the Commissioner, were to certify and send to the Commissioner on or before the second Monday in June following the first day of January as of which the property was valued, a statement giving the description of such property and showing the assessed valuation thereof. They were required at the same time, to certify and send him a short description of all the real property in their respective taxing districts, used or owned for railroad purposes excepting the main stem or roadbed and track not exceeding one hundred feet in width of each railroad.[6] The assessors were also required to certify to the Commissioner the local rate of taxation for county and municipal purposes as soon as it should have been determined, and such other information obtained in the course of the performance of their duties as the Commissioner should require of them.[7] In order to obtain the facts necessary for the discharge of his duties the Commissioner was empowered to use any lawful means he deemed necessary. Thus he was empowered to employ

2 N.J.S.A. 54:20–1 *
3 N.J.S.A. 54:20–2 *
4 N.J.S.A. 54:22–1 *
5 N.J.S.A. 54:22–1 *
6 N.J.S.A. 54:22–3 *

7 N.J.S.A. 54:22–4 *
* Indicates statute repealed by L.1941, c. 291, p. 798, Section 75. Effective July 22, 1941.

surveyors if dissatisfied with information otherwise obtainable, and could employ such assistants in making his valuations as should be necessary to complete them in due time.[8] Each company running, operating or constructing a railroad in New Jersey was required on or before March first in each year to return to the State Tax Commissioner statements or schedules showing its property as it existed on the first day of January preceding; the information required in this statement was very extensive and exhaustive, but it need not be gone into in detail here.[9] If the returns were not made the Commissioner was required to ascertain the necessary facts from the best information he could obtain and in such manner as he should find convenient, using his personal knowledge and judgment.[10] Upon his completion of the valuation of the property described in subdivisions I, II and IV, supra, 152 F.2d page 411, the Commissioner was required to assess such property and proceed to compute the tax thereon at the "average rate of taxation."[11] This "average rate of taxation" was computed in the following manner: On or before April first in each year the assessor in every taxing district was required to prepare and forward to the State Tax Commissioner a certificate, under his hand and seal, duly sworn to under oath, certifying to the Commissioner the true value of all property, real and personal, located in his taxing district, other than the property of railroad and canal companies the taxation of which was provided for in the Statutes here analyzed but including therein the assessed value of railroad and canal companies particularly described in Subdivision II, suura, 152 F.2d page 411, and he was required also to certify and report the rate of taxation in his taxing district for that year. The aggregate value of all the property, real and personal, so certified, was deemed to be the aggregate value of the general property in the state. In each taxing district the amount obtained by multiplying the value of all the property in the taxing district by the rate of taxation therein was deemed to be the total taxes of the taxing district, and the aggregate of the total taxes so ascertained was deemed to be the aggregate taxes of the state. The "average rate of taxation" was computed and determined by the Commissioner by dividing the aggregate taxes by the aggregate value of the general property in the state. The rate so arrived at and determined was entered upon the records of the State Tax Department and constituted the "average rate of taxation" for that year.[12] If an assessor in a taxing district failed to make the required certificate, the State Tax Commissioner was required and empowered to ascertain, in such manner as he deemed most practicable, the aggregate value of all the property in the taxing district required to be included in such certificate and the total taxes in such district. The amounts fixed by the Commissioner were deemed to stand as the aggregate value and the total taxes for the year for the taxing district.[13] In regard to that type of property classified under subdivision II, 152 F.2d page 411, supra, on or before December tenth following the completion of his valuation in each year the State Tax Commissioner was required to certify the value of the real estate used for railroad purposes in each taxing district, classified under subdivision II, to the county boards of taxation in the several counties and to the assessors in the several taxing districts in which the property was situated. The statute so ordering provided that the right of hearing provided by law should in no way be restricted or abridged.[14] The value of the property so certified was required to be included in the amount of ratables to be taxed in the several taxing districts, and the necessary tax rate and the amount of the ratables for such districts were required to be ascertained by the county board of taxation in each county and certified to the State Tax Commissioner on or before the first day of April following the receipt from the State Tax Commissioner of the certificate of values mentioned in the preceding sentence.[15] Upon receipt of the certificate from the county boards the Commissioner was required to include in the taxes to be assessed by him upon the railroad property, payable in that year, a tax

---

8 N.J.S.A. 54:22–5 *
9 N.J.S.A. 54:23–1 *
10 N.J.S.A. 54:22–5 *
11 N.J.S.A. 54:24–2 *
12 N.J.S.A. 54:24–3 *
13 N.J.S.A. 54:24–4 *

14 N.J.S.A. 54:24–8 *
15 N.J.S.A. 54:24–9 *
* Indicates statute repealed by L.1941, c. 291, p. 798, Section 75. Effective July 22, 1941.

upon the property classified under subdivision II, supra, page 11, at the rate in each taxing district so certified by the county boards of taxation and the said property was not subject to any other tax.[16]

### (2) Method of Reviewing Assessments by the State Tax Officers.

(a) On the first Monday of July after the filing of the returns, the Commissioner was required to sit at the State House at Trenton, and to give all companies interested a hearing, touching the valuation and assessment of their property. He was empowered to adjourn from day to day, and could, if he saw fit, require all arguments and communications to be presented in writing.[17] The Commissioner was further required to sit on the second Monday of January in each year at the State House, Trenton, for the purpose of reviewing his assessments of railroad property made as of January first of the previous year; he was empowered to adjourn from time to time until he should have finished the hearings.[18] Any railroad or the Attorney General on behalf of the state and of the taxing districts, claiming that error had been made in the assessment of railroad property, could, on or before the second Monday of January, file a complaint specifying the grounds of complaint and the relief sought; the State Tax Commissioner was thereupon required by statute to review the said assessment and correct the same as should appear just.[19] Ample provision was made for notice to the interested parties.[20] The Tax Commissioner on said review was empowered to issue subpoenas and examine witnesses and call for the production of books and papers. Also, he was entitled to use his personal knowledge and judgment as to the value of the property.[21] The Attorney General or his deputy attended the hearings as representative of the State.

(b) Any railroad company, or the Attorney General on behalf of the State, or, in respect to second-class property, the authorities of the taxing district, desiring to contest the final determination of the State Tax Commissioner upon review, or the validity or amount of the tax levied upon the railroad company, or any railroad company or the Attorney General on behalf of the State and of the taxing districts claiming that there had been illegal discrimination in the assessment of any property or in the levying or imposing of the tax thereon, or that there had been illegal discrimination in the assessment of railroad property as compared with the assessment of property generally, could, under the statutes, on or before the third Monday of June following the levying or imposing of the tax, file a written complaint with the State Board of Tax Appeals, specifying the grounds of complaint and the relief sought.[22] Ample provision was made for notice to all interested parties.[23] The State Board of Tax Appeals was required to meet on the third Monday of June in each year at the State House in Trenton for the purpose of fixing a time and place for the hearing of any complaint so filed. The Attorney General or his deputy represented the State at such hearings. If it was made to appear upon such hearing that any such assessment or tax was illegal, excessive, insufficient, or that there had been illegal discrimination in the assessment, the Board was required to correct, adjust and equalize the assessment and tax of such property.[24]

### (3) Judicial Review of Tax Assessments.

If any railroad company, or the Attorney General on behalf of the State, or in respect to second-class property, if the authorities of any taxing district desired to contest the final determination of the State Board of Tax Appeals, such contest could be made under the statutes by certiorari, provided that the application therefor was made within three months from the date of the certification to the State Tax Commissioner of the final determination of the State Board of Tax Appeals.[25] If the Supreme Court allowed the writ to a railroad company, the latter was obligated to pay that portion of the tax not in dispute as a condition precedent to prosecuting the writ. The payment of the part

---

[16] N.J.S.A. 54:24-10 *
[17] N.J.S.A. 54:26-1 *
[18] N.J.S.A. 54:26-2 *
[19] N.J.S.A. 54:26-3 *
[20] N.J.S.A. 54:26-4 *
[21] N.J.S.A. 54:26-4 *
[22] N.J.S.A. 54:26-7 *

[23] N.J.S.A. 54:26-8 *
[24] N.J.S.A. 54:26-9 *
[25] N.J.S.A. 54:26-11 *
* Indicates statute repealed by L.1941, c. 291, p. 798, Section 75. Effective July 22, 1941.

in dispute was stayed until the controversy had been determined by the Court. If it was made to appear before the Supreme Court on the writ of certiorari that the final determination of the State Board of Tax Appeals in respect to any such assessment or tax in controversy was illegal, excessive, insufficient, or that there had been illegal discrimination in the assessment, the Court was required by statute to correct, adjust and equalize such assessment and tax or refer the same back to the State Tax Commissioner who was then required to correct, adjust and equalize the assessment and tax in accordance with the instructions or decisions of the Court.[26] The statutes provided that in any suit or proceeding, except on such complaint before the State Board of Tax Appeals or on such certiorari, the certificate and report of the State Tax Commissioner should be conclusive and should have the force and effect of a judgment of a Court of record having competent jurisdiction, and the proceeding whereon such certificate and report were founded should not be inquired into.[27] The judgment of the Supreme Court on certiorari may be reviewed by New Jersey's highest tribunal, the Court of Errors and Appeals.

## The Applicable Law.

To recapitulate very briefly, certain taxes are allegedly owing the State of New Jersey for the years 1932-1939. Those taxes fell due prior to the petition of the Debtor in bankruptcy. Although there had been a great deal of litigation in the matter antedating the bankruptcy petition, all of which ended finally in decisions against the now Debtor, the trustees of the Debtor, after the bankruptcy, petitioned the Bankruptcy Court to determine the validity of these taxes and, in effect, asked that the taxes be materially reduced. As authority for such action by the Bankruptcy Court, they cite Section 64, sub. a, of the general Bankruptcy Act, 11 U.S.C.A. § 104, sub. a. This section reads, in part, as follows:

"The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates * * * shall be * * * (4) taxes legally due and owing by the bankrupt to the United States or any State * * *: Provided * * * That, in case any question arises as to the amount or legality of any taxes, such question shall be heard and determined by the [Bankruptcy] court * * *."

"The District Court has issued an order confirming a Master's Report, which latter purports to find jurisdiction in the District Court. We are asked to review the legality of that order.

The case of Arkansas Corporation Commission et al. v. Thompson, 313 U.S. 132, 61 S.Ct. 888, 889, 85 L.Ed. 1244, is directly in point. It is interesting to note that the Attorney General of New Jersey filed a brief in that litigation as amicus curiæ. The question there involved, in the language of the Court, concerned "the right and power of a federal bankruptcy court to revise and redetermine for state tax purposes the property value of a railroad (Missouri Pacific) in reorganization under section 77 of the Bankruptcy Act, * * * the state (Arkansas) having already determined such value through its own taxing officials and in accordance with the procedure prescribed by valid state legislation." The District Court held that it did have such power and the Circuit Court of Appeals affirmed. 8 Cir., 116 F.2d 179. The United States Supreme Court reversed that decision. Mr. Justice Black, speaking for the Court at pages 142 and 145, of 313 U.S., at page 891 of 61 S.Ct., 85 L.Ed. 1244, said:

"It is thus obvious that the trustee's petition, which the bankruptcy court refused to dismiss, rested entirely upon the assumption that section 64, sub. a (4), gave the bankruptcy court power to hold a completely new hearing in order to set its own value on the property, regardless of the value fixed by the state through its expert and specially constituted quasi-judicial agency.

"But we do not so interpret section 64, sub. a (4). What section 64, sub. a (4) relates to is 'taxes legally due and owing by the bankrupt.' And what that section further provides is that 'in case any question arises as to the amount or legality of any taxes, such question shall be heard and determined by the court; * * *.' Nothing in this language indicates that taxpayers in bankruptcy or reorganization

26 N.J.S.A. 54:26–12 *
27 N.J.S.A. 54:26–13 *

* Indicates statute repealed by L.1941, c. 291, p. 798, Section 75. Effective July 22, 1941.

are intended to have the extraordinary privilege of two separate trials, one state and one federal, on an identical issue of controverted fact—the value of the property taxed. Manifestly, whether or not taxes are 'legally due and owing' to a state depends upon the valid laws of that state. Ad valorem taxes depend upon a determination of value. The governmental function of fixing the value for tax purposes has rarely, if ever, been a judicial function. The 'legality' of the action of Arkansas in entrusting the determination of value to its Corporation Commission is not challenged here, as of course it could not be. If the Commission properly found the value of the property, the 'amount' of the taxes is not in question. For it is not asserted that the Commission made an improper arithmetical computation in applying the legal tax rate to the determined property value."

The Court goes on to distinguish the Arkansas case from the case of State of New Jersey v. Anderson, 203 U.S. 483, 27 S.Ct. 137, 51 L.Ed. 284, saying:

"But in that case the trustee argued in his brief before this Court that under controlling New Jersey law 'the assessors acted ministerially, not judicially', their 'determination was merely computation', and their actions exceeded their statutory authority.

"The Arkansas Corporation Commission, however, does not act ministerially. On the contrary, it is a quasi-judicial agency entrusted with wide responsibilities in connection with the general tax system of the state. Upon it the state relies for the hearing and determination of matters essential to the maintenance and fair functioning of a uniform tax system.

\*     \*     \*     \*     \*

"If the trustee had availed himself of his right of appeal to the courts of Arkansas, with an ultimate right of appeal to this Court for final determination of federal questions, it is difficult to believe that it would now be seriously argued that Congress, by section 64, sub. a (4), intended to impose upon the bankruptcy court the unusual power and delicate duty of trying out afresh the facts found by the state with relation to the value of property. And there is no more reason to assume that Congress intended that the bankruptcy court should fail to give respect to an unappealed determination of

value made by the Arkansas Corporation Commission. Bankruptcy and reorganization proceedings today cover a wide area in the business field. But there is nothing in the history of bankruptcy or reorganization legislation to support the theory that Congress intended to set the federal courts up as super-assessment tribunals over state taxing agencies. The express legislative purpose of Arkansas to move towards a more nearly uniform and fairly distributed tax burden through relying on supervision by a single agency could be in large part frustrated by the construction of the Bankruptcy Act for which the trustee here contends. Section 64, sub. a, thus construed, would tend to obstruct, and not to facilitate, the enforcement of state tax laws. Nothing in the language of the Act requires such a construction. And the policy of revising and redetermining state tax valuations contended for by the trustee would be a complete reversal of our historic national policy of federal non-interference with the taxing power of the states.

"For the reasons given, it is our opinion that the District Court should have dismissed the trustee's petition."

The Arkansas opinion was filed in 1941. In 1944 this Court had occasion to interpret that decision in the case of In re Monongahela Rye Liquors, Inc., 3 Cir., 141 F.2d 864, at page 868, where Judge Jones, for the Court, said:

"The view we take of the decision in the Thompson case is that where, after a hearing, a quasi-judicial body, thereunto duly empowered, determines the amount of a tax due, with the right on the part of the taxpayer to a judicial review of the determination, all conformable with the requirements of due process, such determination, upon becoming final by operation of law, is conclusive upon a court of bankruptcy save for mathematical error in the computation of the amount of the tax or legal error in its assessment. \*   \*   \*"

The Circuit Court of Appeals for the Second Circuit discussed the Arkansas holding in Lyford v. City of New York, 137 F.2d 782. Judge Clark said at page 786 of 137 F.2d:

"In that case the Court distinguishes the Anderson case, because in the latter the New Jersey tax assessors acted only in a ministerial capacity, while the Arkansas

Commission acted in a quasi-judicial capacity and had finally settled the tax upon the participation of the trustee, who then did not take the appeal provided by the state law. Hence in the Thompson case the assessment of the tax had become res adjudicata by virtue of the state proceedings when the bankruptcy court assumed the power to consider it. Moreover, the question involved was that of valuation of the property of the railroad in the state— a matter the courts generally would not review on appeals from administrative bodies and which the Court concluded Congress did not intend should be reviewed in bankruptcy. In other words, the decision concerns a tax finally settled without appeal by the state authorities and an attack not·on issues of legality, but on issues of valuation. Review in such a case involves the upsetting of state-taxing activities in ways beyond that permitted as. to administrative action generally, as had been pointed out by commentators and as was held by the Supreme Court."

Inherent in all of the decisions is the strong sentiment that the Federal Court should scrupulously refrain from interference with the tax-machinery of a state unless that machinery is serving to deprive a litigant of his federally guaranteed rights. In line with that basic policy Mr. Justice, now Chief Justice Stone, in Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248, a case involving an attempt in the Federal Courts to enjoin the collection of a state tax, says at page 270 of 292 U.S., at page 703 of 54 S.Ct.:

"Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to· the precise limits which the statute has defined. See Matthews v. Rodgers, supra, 284 U.S. [521], at page 525, 52 S.Ct. 217, 76 L.Ed. 447. * * *."

The Rodgers case, cited in Healy v. Ratta, supra, has again been referred to in what is perhaps the most recent re-enunciation of the principles governing federal interference with state tax matters, Lawrence Print Works v. Lynch, 1 Cir., 146 F.2d 996. There Judge Peters says at page 997 of 146 F.2d:

"The plaintiffs claim to have acquired the right to an abatement of taxes by virtue of an oral agreement with the assessors approved by the tax commissioner of Massachusetts. The claim was rejected and the right to abatement denied by the defendant board of assessors. It is apparent that the relief sought in this suit,— a compulsory reversal by the assessors of their action in laying taxes on the property of the plaintiffs without an abatement,— is a direct interference with the fiscal affairs of the state, which has been strongly condemned by the Supreme Court. Matthews v. Rodgers, 284 U.S. 521, 525, 52 S.Ct. 217, 76 L.Ed. 447; Commonwealth of Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841, 96 A.L.R. 1166; Great Lakes Dredge & Dock Co. v. Huffman,· 319 U.S. 293, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407.

"The opinion in the Huffman case, decided in 1943, contains the following quotation from Matthews v. Rodgers, supra: 'The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States.' "

Comparing the functions of the Arkansas Tax Commission as set out in the Arkansas Thompson opinion with those of the New Jersey tax authorities, we find:

I. "Before entering upon his duties in the assessment of property, each member of the Commission [the Arkansas Commission] must subscribe to an oath that he will well and truly value and assess all property required to be assessed." 313 U.S. 132, at page 139, 61 S.Ct. 888, at page 890, 85 L.Ed. 1244.

The State Tax Commissioner of New Jersey was required, before entering upon the duties of his office, to make and subscribe an oath, to be filed in the office of the Secretary of State, "that he will faithfully, impartially and without fear, favor or prejudice discharge the duties of his office." N.J.S.A. 54:1–4. (This statute was repealed, L. 1944, c. 112, art. 8, Sec. 10, effective July 1, 1944. The repealer does not concern us.)

Each member of the New Jersey State Board of Tax Appeals was required, be-

fore entering upon the performance of his duties, to file with the Secretary of State an oath taken before a Justice of the Supreme Court, that he will faithfully discharge the duties of his office. N.J. S.A. 54:2–5.

II. "The Commission [Arkansas] has full power to summon witnesses and hear evidence, but further, before assessments are finally determined, all persons interested have the right, on written application, to appear and be heard." 313 U.S. 132, at page 139, 61 S.Ct. 888, at page 890, 85 L.Ed. 1244.

The New Jersey State Tax Commissioner was required to hold hearings for all companies interested on the first Monday in July et sequitur, touching the valuation and assessment of their property. N.J.S.A. 54:26–1 (supra, 152 F.2d 413). He was further required to hold hearings on the second Monday of January et sequitur for the purposes of reviewing his assessments of railroad property. N.J.S.A. 54:26–2. (supra, 152 F.2d page 413). The Tax Commissioner on this review was empowered to issue subpoenas and examine witnesses and call for the production of books and papers. N.J.S.A. 54:26–4 (supra, 152 F.2d page 413).

Any person feeling aggrieved by the decision of the Commissioner could, upon the filing of a written complaint, appeal his decision to the State Board of Tax Appeals. N.J.S.A. 54:26–7 (supra, 152 F.2d page 413). That Board was required to grant a hearing to the complaining party and correct any inequities which were shown to exist. N.J.S.A. 54:26–9 (supra, 152 F.2d page 413).

III. "The Corporation Commission has been chosen by Arkansas as the ultimate guardian of the rights of the state and its taxpayers, subject only to that judicial review provided for by the state." 313 U.S. 132, at page 139, 61 S.Ct. 888, at page 892, 85 L.Ed. 1244.

In New Jersey either the Attorney General on behalf of the State, or any railroad company could appeal any determination of the State Tax Commissioner to the the State Board of Tax Appeals, calling upon the latter to adjudicate their respective rights. N.J.S.A. 54:26–7 (supra 152 F.2d page 413).

The statutes provided that in any suit or proceeding, except on a complaint before the State Board of Tax Appeals or on certiorari to the Supreme Court, the certificate and report of the State Tax Commissioner should be conclusive and should have the force and effect of a judgment of a Court of record having competent jurisdiction, and the proceeding whereon such certificate and report were founded should not be inquired into. N.J. S.A. 54:26–13 (supra, 152 F.2d page 414).

IV. "The Arkansas Corporation Commission * * * is a quasi-judicial agency entrusted with wide responsibilities in connection with the general tax system of the state. Upon it the state relies for the hearing and determination of matters essential to the maintenance and fair functioning of a uniform tax system." 313 U.S. 132, at page 144, 61 S.Ct. 888, at page 892, 85 L.Ed. 1244.

The New Jersey State Board of Tax Appeals, if it was made to appear on a hearing that any assessment or tax was illegal, excessive, insufficient, or that there had been illegal discrimination in the assessment, was required to correct, adjust and equalize the assessment and tax of such property. N.J.S.A. 54:26–9 (supra, 152 F.2d 413).

From the above and a study of the statutes governing the taxation of railroad property in New Jersey it is evident that both the State Tax Commissioner and the State Board of Tax Appeals functioned in a quasi-judicial manner. Hearings were always available to interested parties, as was the machinery to bring those hearings up to the standard required by due process. In no sense could the duties of the taxing authorities be classed as merely ministerial or arbitrary.

The second requirement of the Monongahela doctrine, that of the availability of judicial review, is equally well satisfied. Any party considering himself aggrieved by the decision of the State Board of Tax Appeals could appeal to the New Jersey Supreme Court by certiorari. N.J.S.A. 54:26–11 (152 F.2d page 413, supra). If any inequity was shown to exist, that Court was required to correct it. N.J. S.A. 54:26–13 (supra, 152 F.2d page 414). Moreover, the judgment of the Supreme Court could be appealed to the Court of Errors and Appeals.

As we see it, all of the foregoing serves to bring the instant problem within the

418

doctrine of the Arkansas and Monongahela cases. That being so, the only matters left open for the Bankruptcy Court to pass upon are: (1) Mathematical error in the computation of the amount of the tax, or, (2) Legal error in its assessment. In re Monongahela Rye Liquors, Inc., supra. On any question, if any, of "legal error in its assessment," we presume that the District Court will bear in mind our decisions in Lehigh Valley R. Co. v. Martin, 100 F.2d 139 and Central R. Co. v. Martin, 115 F.2d 968 holding certain items to be res adjudicata and no longer open to further litigation. Failure of this opinion to touch upon certain points raised by the State of New Jersey is not to be construed as meaning that they are without merit: rather, our decision renders discussion of them unnecessary.

In No. 8889, Order No. 271 of the District Court is reversed. This disposes of the entire matter before us. The application for a writ of prohibition in No. 8861 is therefore dismissed, without costs to either party as against the other.