SPIOTTA BROTHERS, PLAINTIFF, v. TOWNSHIP OF
MINE HILL, DEFENDANT.

TOWNSHIP OF MINE HILL, PLAINTIFF, v. SPIOTTA
BROTHERS, DEFENDANT.

Tax Court of New Jersey

March 4, 1980.

Charles E. Villanueva, for Spiotta Brothers.

Wiley, Malehorn & Sirota, for Mine Hill (Fredric J. Sirota, appearing).

EVERS, J. T. C.

Spiotta Brothers (taxpayer) appeals from the 1975 denial of the Morris County Tax Board of farmland assessment to 49.6 acres of taxpayer's 60-acre tract. Mine Hill (township) appeals from the county board's 1977 grant of farmland assessment to the entire tract. Although taxpayer took no 1977 cross-appeal, it contends that its lands should have been found to be woodland instead of crop land harvested, which would result in a further decrease in value. Township contends that taxpayer, having filed no cross-appeal, cannot attack the 1977 county board judgment. Township also argues that the 1975 county board action was not based on a farmland application and thus taxpayer cannot, for the first time, raise the farmland question here. Township further argues that because taxpayer is holding the lands for speculation it cannot take advantage of the favored farmland tax treatment. Taxpayer's argument that the Freeze Act, N.J.S.A. 54:2–43, should apply to 1976 is rendered moot in the view taken of this case.

Township's contention that taxpayer cannot question the 1977 county board judgment by reason of its failure to file a cross-appeal is clearly erroneous. In Hackensack v. Rubinstein, 37 N.J. 39, 178 A.2d 625 (1962), our Supreme Court held that on appeal to the Division of Tax Appeals to increase an assessment filed pursuant to N.J.S.A. 54:2–35, a cross-appeal was not necessary in order to vest the Division with authority to entertain the charge that the assessment was already too high and should be reduced. To the same effect was the court's reasoning in Rek Investment Co. v. Newark, 80 N.J.Super. 552, 194 A.2d 368

(App.Div.1963). On appeal by the taxpayer the court, at 558, 194 A.2d at 372, held "notwithstanding the absence of a cross-appeal, the Division had jurisdiction to increase the assessment appealed from where such action was necessary to bring the assessment to equalized true value." Any doubt as to the application of such reasoning to farmland controversies was resolved in *Bunker Hill Cranberry Co. v. Jackson Tp.*, 144 *N.J.Super.* 230, 365 *A.2d* 204 (App.Div.1976), which held the municipality could question whether all of the taxpayer's lands qualified for farmland assessment even though the taxpayer alone appealed.

I am satisfied that the action below was based on taxpayer's appeal from a denial of its farmland assessment application. Although neither the application nor the petition to the county board were offered into evidence, the undisputed testimony of taxpayer supports that finding. In fact, at the hearing before the Division the assessor conceded that 10.4 acres did satisfy the farmland requirements. Furthermore, it is obvious that the 1975 county board judgment in the amount of $98,400 was arrived at by allotting $400 an acre (the value of "fair" farmland in Morris County as recommended by the State Farmland Advisory Committee) to the 10.4 acres and allowing the original assessment of $1,900 to remain on the 49.6 acre balance.

Township's argument that the landowner, being in the real estate business, is actually holding the lands for speculation and should thus be prohibited from claiming a farmland deduction, has often been rejected and is not to be considered in such determinations. See *Andover Tp. v. Kymer*, 140 *N.J.Super.* 399, 356 *A.2d* 418 (App.Div.1976), and *Urban Farms, Inc. v. Wayne Tp.*, 159 *N.J.Super.* 61, 386 *A.2d* 1357 (App.Div.1978).

Turning to the questions of farmland qualification and value, it is noted that the taxpayer presents alternative arguments. While conceding that only 10.4 acres were devoted to the raising and harvesting of traditional farm products, it claims that the remaining 49.6 acres was actually part of the farm for a number of years and was appurtenant to and reasonably necessary for

its support and maintenance. In support of that position taxpayer obviously relies on *Andover Tp. v. Kymer, supra.* Alternatively, it argues that a further reduction in value is warranted in that the 49.6 acres were actively devoted to the production of trees and forest products and should therefore be classified as woodland.

Roland Spiotta testified that the premises actually consisted of 70.4 acres, as ten contiguous acres were located in neighboring Randolph Township (for which farmland assessment had been granted since 1975) and on which the family dwelling was located. He stated that farming activities had been conducted on part of the land since the late 1930s. However, for some time prior to 1973 no farming activity took place and the farm portion became overgrown. In 1973 a 20.4-acre portion (including the Randolph ten acres) was reclaimed by removing the small trees and clearing out the brush that had grown on the land. The area was prepared and planted with corn, all at an estimated cost of $3,000–$3,500.

Spiotta testified that the remaining 49.6 acres were heavily wooded and low and wet in many areas. Over the objection of the township, a map dated January 1976, entitled "Wet Lands and Floodland Plains Areas of Mine Hill", which was part of the master plan recommended by the local planning board, was admitted into evidence. This map showed that approximately 40% of the tract was wet up to about four months of the year, 20% was wet for six to eight months, with the balance being categorized as "urban land-variable" or dry. It is within this latter category that the 10.4-acre farm portion is located.

In 1973 Spiotta contacted a Paul Berezny, an area forester employed by the New Jersey Bureau of Forestry, (a state agency which supplies technical assistance to private woodland owners) to explore the possibility of commencing a forestry management program on the 49.6 acres. The forester testified that in 1973 he walked the property with Spiotta, on the basis of which he prepared a letter of recommendation in May 1973. This letter, as well as his testimony, while including recommen-

dations as to thinning and cutting, strongly suggested that the trees cut and removed in connection with the reclamation of the farm area be sold as firewood. He estimated that at least ten cords be harvested annually. Although he communicated with the property owner in 1973 and 1974, the testimony is vague and inconclusive as to what management program activities, if any, took place during that period.

Admitting that he had no specific information on which to prepare a survey or map prior thereto, in September 1975 the forester prepared a map identifying and locating the various stands of trees. This map served as a basis for a more detailed map prepared one month later which was supplemented by a letter that traced the progress of the management plan and contained recommendations with regard to the thinning and cutting operations to be carried out in various areas. Information was also furnished to the landowner regarding the possibility of participating in government cost-sharing programs. Berezny testified that the program was ongoing and showing improvement. His last inspection of the property was very recent.

The taxpayer's accountant, who kept its books, received and deposited its receipts and prepared its income tax returns during the period in question (1973 through 1977), corroborated Spiotta's testimony with respect to the income received from the tract from sales of farm and forest products. Noting that the farm income included sales of crops produced on the Randolph portion of the farm, one-half of that income has been utilized here. The income was as follows:

| | FARM | FOREST | TOTAL |
|---|---|---|---|
| 1973 | – | $1,000 | $1,000 |
| 1974 | $ 560 | 300 | 1,360 |
| 1975 | 1,125 | 800 | 1,925 |
| 1976 | 750 | 500 | 1,250 |
| 1977 | 146 | 560 | 706 |

In addition to the above, in 1975 the property owner received a $100 subsidy and in 1977 a subsidy of $660 in connection with the forest and farm programs, respectively. It appears that the 1977 subsidy was for seed, while the 1975 grant was obtained in

connection with a Forestry Incentive Program. It does not appear that either subsidy was obtained pursuant to a soil conservation program.

The sole witness for the municipality was its tax assessor, who stated that he made personal inspections of the tract on several occasions during each year in question. He saw no evidence of any cuttings or thinning in 1973. He acknowledged that, in subsequent years, considerable quantities of trees had been cut, but claimed that the timbering followed no definite pattern and that the trees had been cut indiscriminately. While stating that, initially, most of the trees had been removed from the farm part of the property, he admitted that in subsequent years he saw evidence of cuttings from the wooded area. In making his inspections he did not penetrate the heavy growth areas, but was certain that he viewed most of the tract.

Concerning the question of value, the municipality relied on the 1975 county board judgment of $98,400 as representing the true value of the tract. The taxpayer argues, alternatively, that the entire tract has a $400 per-acre value (thereby agreeing with the values established by the county board for 10.4 acres in 1975 and the entire 60 acres in 1977) or, if found to be woodland, a per-acre value between $14 and $22 as suggested by the State Farm Land Advisory Committee for Morris County woodlands. While the testimony indicated that much of the wooded area was low, wet and of poor quality, which testimony was supported by the findings of the township planning board and incorporated in the wetland-floodland map, no evidence was presented which would place the land in one or more of the specific value categories (A through E) suggested by the Advisory Committee.

*N.J.S.A.* 54:4–23.1 *et seq.*, establishes that in order to qualify for farmland assessment the land, consisting of at least five acres, must have been actively devoted to agricultural or horticultural use for at least the two years immediately preceding the tax year in issue. During the two year period the products produced (together with any soil conservation program pay-

ments) must have averaged at least $500 a year or it must be clearly evident that such income will be received within a reasonable time. A 1974 amendment provided that each acre in excess of five must produce $5 income a year unless it is woodland or wet land, in which case the requirement is $.50 an acre.

That the taxpayer's lands satisfy the minimum acreage and income requirements cannot be questioned. Noting that the critical years here involved are 1973 through 1976, the annual income requirements are $775 if the 49.6 acres are not woodland and $527.50 if they are woodland. In either case, the income requirements are satisfied.

 It is well settled that woodlands, in and of themselves, qualify as agricultural products. *Urban Farms, Inc. v. Wayne Tp., supra.* Woodland and other acreage having a marginal value for agricultural use may also qualify for farmland assessment when it is pertinent to and reasonably required for purposes of maintaining the land which is actually devoted to agricultural use, particularly where it has been part of the farm for a number of years. *Andover Tp. v. Kymer, supra.* To be determined, therefore, is whether the 49.6 acres are woodlands as described in *Urban Farms* or are that marginal type land as referred to in *Andover,* or neither of them. The question of land value must also be resolved.

*Urban Farms* involved in 1972 and 1973 assessments of 927 acres which were part of approximately 3,000 acres acquired by the taxpayer in 1954. Over the years various farming activities were conducted on the land. While in the two years immediately preceding the tax years in question there were sales of firewood, live trees, evergreens and cider (from a seven acre orchard), the dominant activity was the dedication of the land to a woodland management program for the commercial production of lumber. In 1971, the taxpayer entered into a ten-year contract with a forester to manage the land pursuant to a silviculture program by which, in its overall purpose to increase the woodlands' productivity, the trees are selectively thinned

and cut and seedlings planted to eventually obtain the ultimate crop trees per acre. The testimony and supporting records presented by the taxpayer were technical and complete in detail and included the initial and projected values, the estimated per-acre annual growth, the amount of board feet to be cut in subsequent years and the seedling planting program. The woodland was certified as a tree farm by the American Forestry Institute. The court found substantial credible evidence was presented below to warrant a finding that the land was entitled to a farmland assessment.

■ I cannot conclude that the activities conducted on the 49.6 acres in 1973 and 1974 were of such nature as to qualify that land for the favored treatment in 1975 under *Urban Farms*. Although I recognize that the income derived from the sale of firewood satisfied the minimum requirements; that trees were growing and were cut, and that trees qualify as agricultural products, the meager and vague evidence produced does not support a finding that they were *produced*, as that term is used in the statute. Nor can I conclude, even if produced within the legislative meaning of that term, that such production came from the wooded portion of the tract. To the contrary, the forester's testimony that he had no specific, detailed information on which to base a survey prior to 1975, his recommendation that the wood resulting from the clearing of the farm area be sold as firewood, the total absence of clarity and preciseness as to the nature of the activity, if any, conducted on the wooded area, suggests that no management program was actually in effect at that time. The testimony further indicates the $1,800 income realized in 1973 and 1974 was from the sale of wood resulting from the reclamation of the 10.4-acre (and perhaps from the Randolph Township portion) farm area. This view also finds support in the testimony of the assessor who saw no evidence of cuttings in the wooded portion of the tract in his early inspections.

■ The Farm Land Assessment Act represents a departure from the general principles of real estate taxation under which

each property owner is obliged to pay his proportionate share of taxes based upon the true value of his property. As such, it is related to an exemption, and I am thus constrained to strictly construe the statute. I find that a walk through the woods, random visits to the land and a letter from the forester, while perhaps indicating intent, is insufficient to qualify the land for farmland assessment. Mere intent is not enough. On appeal to the Division of Tax Appeals there is a presumption in favor of the correctness of the county board judgment, *Riverview Gardens v. North Arlington*, 9 *N.J.* 167, 87 *A.*2d 425 (1952). That presumption stands until sufficient and competent evidence is produced to overcome it, and such evidence must be definite, positive and certain in quality and quantity. *Aetna Life Ins. Co. v. Newark*, 10 *N.J.* 99, 89 *A.*2d 385 (1952). The testimony here with regard to the 1975 county tax board judgment falls far short of satisfying that criteria.

For the same reasons I find no justification for interfering with that 1975 judgment on the basis that the entire 60 acres qualifies for farmland treatment under the theory expressed in *Andover Tp. v. Kymer, supra.*[1] In *Andover* farmland assessment was allowed a 210-acre tract where only 100 acres were actually being farmed. In support of its decision the court noted that the nonfarm area was marginal for farming purposes and was reasonably required for the purposes of maintaining the land actually devoted to farm use. No such showing has been made here.

Commencing in 1975 Berezny, on the basis of his inspections and detailed information, for the first time prepared and furnished a definite plan for the management of the woods. Shortly thereafter another plan, complete with detailed recommendations as to the treatment to be accorded to specific areas of the woodlands, was furnished to the taxpayer. A subsidy was granted under the Forestry Incentive Program. The forester

---

[1] The fact that the county board apparently based its judgment on *Andover* in 1977 after rejecting the argument in 1975 may have resulted from the fact that *Andover* was decided in 1976.

emphasized that his recommendations were being followed completely. In 1975 the farm area (including the Randolph part) produced $2,250 in income as compared with $1,120 in 1974 and none in 1973, a fact which belies any suggestion that the timber-sales resulted from trees cleared from that area. The assessor also acknowledged that, contrary to the earlier years, a tremendous amount of trees had been removed and that they were removed from the front, middle and rear portions of the 49.6-acre tract. The forester testified that the program had been carried on through 1976 and 1977 and, except for planting alfalfa in 1977, no changes were made in the operation of the tract.

█ Although the taxpayer had not entered into a ten-year contract, nor devised a relatively sophisticated silviculture program as was the case in *Urban Farms*, and while the quality and quantity of the testimony was not the equal of the detailed testimony adduced in *Urban Farms*, I am satisfied that the minimum statutory requirements were met so as to qualify the tract for the favored treatment for 1977. I am satisfied that the entire tract was actively *devoted* to the *production* of agricultural products useful to man, *i. e..*, corn, alfalfa, trees and forest products.

*N.J.S.A.* 54:4–23.7 contains the guidelines to be followed by the assessor in valuing farmland. It states that, in addition to his own personal knowledge, he shall consider evidence of agricultural and horticultural capability derived from various programs and studies and the recommendations of value of such land as made by any county or statewide committee that may be established to assist the assessor. The State Farmland Evaluation Advisory Committee was created by the Legislature (*N.J. S.A.* 54:4–23.20) for just such a purpose.

According to the statute, the primary objective of the committee shall be the determination of the ranges in fair value of such land based upon its productive capabilities when devoted to

agricultural or horticultural uses. The committee has divided such lands into four groups: crop land harvested, crop land pastured, permanent pasture and woodland. Ranges in value of farmland are determined for each county by capitalizing the net income from farming at a return of 10%. Each land use class is given a productivity rating or multiplier in determining the average value per acre in a given county. Crop land harvested, for instance, is given a productivity rating of 20 while woodland is rated at 1. The low productivity rating of woodland was legislatively recognized by the 1973 amendment to *N.J.S.A.* 54:4–23.5 which increased income requirements for land over five acres by $5 an acre, while woodland is required to produce only $.50 for each additional acre.

In appealing the 1977 county board judgment township offered no evidence for valuation of the land for farmland assessment. The taxpayer, while accepting the recommended values of the advisory committee, failed to produce any evidence of the soil groups pertaining to its lands on which the value ranges ($14–$22 an acre) within the woodland category are based.

While the advisory committee's recommendations are not binding, I do recognize that they result from various studies of available data. Under these circumstances, where no other method of valuation was suggested, I have no reason to not accept the committee's recommended values. Although Spiotta testified the land was of poor quality, more than his unsupported opinion is required to value the land in the low range of the woodland category.

In light of the above I find the 1975 value of these lands to be $98,400 as determined by the Morris County Board of Taxation. In light of this finding taxpayer's argument that the Freeze Act, *N.J.S.A.* 54:2–43, should apply to 1976 is rendered moot. For 1977 the value is found to be $5,300 based on $400 an acre for 10.4 acres and $22 an acre for 49.6 acres.

Judgment shall be entered accordingly.