RIMM, J. T. C.
This local property tax matter involves the issue of valuation for the tax year 1979 and the issues of valuation and discrimination for the tax year 1980.
*54 The subject property is known as Block 3, Lot 2, and the original assessment for each of the years under appeal was the same, as follows:
Land $1,095,000
Improvements 4,375,000
Total $5,470,000
On appeal by the taxpayer to the Monmouth County Board of Taxation the assessment for 1979 was sustained. The 1980 assessment is before the Tax Court on a direct appeal.
The subject consists of 118 acres of land and six structures used for light industrial purposes as follows:
Building Number Square Footage Year of Construction
1 204,000 1961, 1973, 1976
2 800 1973
3 800 1961
4 1,786 1961
5 1,663 1971
6 256 1971
Total 209,305
The property is located on the east side of South Street, just south of its intersection with Route 520. The site is irregular in shape and is basically level with South Street and Route 520. There is frontage of approximately 385 feet on the south side of Route 520 and over 2,500 feet of frontage on the east side of South Street.
The property is in the municipality’s 1-90 zone, which requires a lot size minimum of 90 acres with a maximum of 10% building coverage. It is the only lot in the entire municipality zoned in this manner. Twenty-eight acres are used for the industrial complex and 90 acres are farmed.[1]
The main building is a modern one-story steel frame and masonry light industrial building in good condition. The entire building is sprinklered. The original building consists of an. *55 office area, cafeteria, boiler room and numerous light assembly areas divided by movable partitions. The 1973 addition consists of an enclosed paint shop, storage facilities, office and laboratory areas, and manufacturing and warehouse areas. The 1976 addition has tool-making, office, laboratory, manufacturing, storage and lavatory facilities.
The five satellite buildings, with a combined area of 5,305 square feet, are used for storage, carpenter shop, waste treatment, paint storage and pump house purposes.
The site is improved with approximately 210,000 square feet of macadam parking area and roadways, ten aluminum pole yard lights, a regulation size baseball field, a 125,000 gallon water storage tank, a 7,500,000 gallon water reservoir, fire pumps and pipe, and automatic vehicle gates.
The property is owned by plaintiff and occupied by its S.S. White Division, a manufacturer of dental equipment. The taxpayer acquired the property in 1970 for $2,250,000 and has spent approximately $4,000,000 on additions and site improvements in accordance with its expert’s testimony.
In an appeal to the Tax Court, there is a presumption that the county board judgment is correct. Riverview Gardens v. North Arlington, 9 N.J. 167, 87 A.2d 425 (1952); Glenwood Realty Co., Inc. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963). The presumption stands until it is overcome by sufficient competent evidence. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 89 A.2d 385 (1952); Spiotta Bros. v. Mine Hill Tp., 1 N.J.Tax 42 (Tax Ct. 1980). However, once sufficient competent evidence is produced and the presumption overcome, the matter is not thereby concluded in favor of the complaining party. The court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965). When the court rejects the ultimate conclusions as to true value proffered by the parties’ experts, it should make an independent determination of true value on the basis of those portions of the *56 experts’ testimony which the court finds credible. Samuel Hird & Sons, Inc. v. Garfield, supra; Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31 (Tax Ct. 1980); Newark v. 1013 Corp., 1 N.J.Tax 107 (Tax Ct. 1980).
Both expert witnesses who testified, one on behalf of each party, eschewed the income approach in valuing the subject and agreed generally on the physical aspects of the subject property. Beyond that, there were wide divergencies in their opinions of value and in their methods for arriving at those opinions.
The taxpayer’s witness testified that the property had a fair market value of $3,000,000 as of October 1, 1978, and the same fair market value as of October 1, 1979. It was the witness’ opinion that the value of exceptionally large (100,000 square feet and more) industrial facilities has remained static during the years in question. He used no time adjustments in his market approach and no adjustment for time between the two critical assessing dates.
The witness testified that although he used both the market and cost approaches, he placed strong emphasis on the market approach and less emphasis on the cost approach. In his market approach the witness used six comparable sales, all involving industrial complexes ranging in building size from 54,000 square feet to 472,000 square feet. Only one comparable was in Monmouth County. The other five properties used in the market data approach were all at some distance from the subject. Four were in Middlesex County and one in Mercer County. Based on the comparable sales, the witness opined that the subject had a value of $14.33 a square foot of gross building area, including land, for a total value of $3,000,000. Although the witness stated that the market approach was the better approach here, each comparable property required substantial adjustments to arrive at an indicated value for the subject. While the ultimate net adjustments were not substantial, two of the comparables required six separate adjustments, one required five, and three of the sales required four adjustments each. The strong emphasis placed on the market approach is vitiated by the witness’ own *57 adjustments. In addition, the adjustments were not supported in the market.
In his cost approach the witness used four comparable sales to determine land value. All of these sales were in relatively close proximity to the subject. Two properties were each one mile from the subject, and the other two were each five miles from the subject. The land value of $850,000 given by the witness based on his market approach to land value is reasonable and is accepted by the court. He then calculated the value of the buildings by using a square foot cost based on Marshall Valuation Service, adjusted to the appraisal date of October 1,1978. He added the cost of the on-site improvements to the cost of the buildings to arrive at a reconstruction cost new of $6,264,694. He then depreciated the reconstruction cost new by 65% for total accrued depreciation, that is, physical depreciation, functional obsolescence and economic obsolescence. This total accrued depreciation was based on his analysis of the same six properties which he used in the market data approach, attributing to accrued depreciation the difference between the estimated reconstruction cost new of each of the subject properties and the sale price of each subject property. Such a method of determining depreciation is an acceptable appraising procedure.
Rate abstraction from the market is an effective procedure for developing an estimate of accrued depreciation. It is based on an analysis of sales information; and the study of depreciation as reflected in market situations is also valuable in developing a background for the use of more subjective methods of analysis when market data is not available. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), 250, 251.
A summary of this witness’ cost approach is as follows:
Reproduction cost new $ 6,264,694
Less accrued depreciation (65%) 4,072,051
Depreciated reproduction cost $ 2,192,643
Land value 850,000
Total $ 3,042,643
Rounded $ 3,050,000
Since, as indicated, the witness placed more emphasis on the market approach than the cost approach, his final opinion of value was $3,000,000.
*58 The municipality’s expert, in addition to rejecting the income approach also said that he rejected the market data approach. He testified that he could not find any comparable sales and so his valuation was based solely on what he called “the cost approach.” The witness was a member of the firm which performed the revaluation resulting in the total assessment of $5,470,000 now under attack, but he testified that the property had a value of $6,335,000. When questioned about the difference he indicated that the revaluation was based on certain mass appraisal procedures. His appraisal now was the result of additional work and of a single appraisal made for a single property, and it contained additional information not available at the time of the revaluation. No indication was given of the additional information now available which was not available at the time of the original appraisal, but such additional information and such additional work, as described by the witness, resulted in the following appraisal methodology.
(1) The witness took his indicated purchase price of $2,224,390 which the taxpayer paid for the land and the building then in existence in 1970 and used that as his starting point. The building at the time consisted of approximately 89,000 square feet. He then carried that forward to October 1, 1978 without any adjustments for time and without any other changes of any nature whatsoever by way of depreciation or otherwise. He did not, however, include 45 acres of the subject tract, asserting that such acreage was farmland. He deleted that portion from his appraisal by deducting from the purchase price the value of that land which he appraised at $10,000 an acre. He arrived at the value strictly on the basis of “a judgment call,” even though there is contained in his appraisal one land sale which indicated a value of $14,950. When questioned about the land sale, he indicated that although the information was in his appraisal, he did not use it. '
(2) He then took the cost of each addition constructed since the date of purchase and made certain adjustments. The cost information was given to him by the property owner. He trended the costs up by use of the Real Property Appraisal *59 Manual for New Jersey Assessors (Division of Taxation, Local Property and Public Utility Branch, 3 ed. 1978) and reduced the results for physical depreciation only.
(3) Then he added the original sale price to his adjusted cost figures to obtain the value of the property.
The municipality’s expert’s testimony is summarized as follows:
Purchase price for the subject in 1970 $ 2,224,390
Less value of 45 acres not included in appraisal 450,000
Unadjusted purchase price less value of 45 acres $ 1,774,390
Cost of 1971 addition after cost trending and allowing for physical depreciation 418,556
Cost of 1972 (sic) addition after cost trending and allowance for physical depreciation 3,318,096
Cost of 1977 (sic) addition after cost trending and allowance for physical depreciation 824,416
Total $ 6,335,458
Rounded $ 6,335,500
A similar process was used for the value as of October 1, 1979 except that 90 acres were not included as being farmed and different cost trending factors and physical depreciation allowances were used. The value determined by the witness as of October 1, 1979 was $6,646,500.
When using the cost approach an appraiser
... obtains a preliminary indication of value by adding to the estimated value of the land, an estimate of the depreciated reproduction cost of the building and other improvements.... Essentially, the cost approach provides for an estimate of the depreciated reproduction or replacement cost (new) of the improvements to which is added an estimate of land value. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 66, 263]
In spite of the label of “cost approach” placed on his valuation method by the witness, it is a meaningless hodgepodge of the market approach and the cost approach. He took the sale price in 1970, without any adjustments of any nature whatsoever, and indicated that that is the present value of the land and the value of so much of the structure as existed at the time of the purchase in 1970. His explanation for this part of his approach was that the sale of the subject property was the best “comparable” to use in determining value. However, the sale price of the *60 subject property is irrelevant to the cost approach for the improvements. In valuing the remaining improvements he took the cost figures given to him by the owner without determining what were the components involved in the construction and whether the cost data were realistic. He then depreciated the cost for physical depreciation only based on a 50-year life, or 2% a year, for each separate addition. He made no allowance for functional or economic obsolescence, stating that he could not obtain such data from the market. He therefore concluded that no functional or economic obsolescence was indicated even though the main structure consists of one building of 204,000 square feet; there is a paint shop in the complex which the witness himself indicated is an overimprovement; he does not dispute the taxpayer’s witness’ evidence that the typical industrial user does not require cooled manufacturing space and the location of the property adversely impacts on accessability to markets resulting in substantial economic obsolescence.
The explanation given by the witness for deducting the value of 45 acres from the original purchase price was that, for the tax year 1979, 73 acres of the tract were included with the buildings while the remaining 45 acres were, he asserted, assessed separately as farmland. Apparently a substantial portion of the tract was farmed, but nowhere in the record is there any support for the witness’ testimony concerning farmland assessment. To the contrary, the pretrial order provides that “the parties stipulate that the lot and block numbers, the original assessments and the county board judgment for 1979 are correctly set forth in the complaint(s).” Both complaints give only the assessment and the county board judgment information set forth above. There is no reference to farmland assessment. Since farmland assessment is not an issue in this case, the reference to such assessment casts further doubt on the reliability of the municipality’s valuation methods.
It may be that the witness was using a combination of two approaches in his appraisal.
... [S]ome appraisers prefer to combine approaches, avoiding separate presentations of a cost approach, a market data (direct sales comparison) approach, and *61 an income (economic) approach. The chosen format for the appraisal report is less important than the requirement to utilize all the recognized appraisal concepts and techniques that will contribute to a solution of the problem or to a proper valuation of the property being appraised. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate, supra at 66; emphasis supplied]
It has been said on a number of occasions that there is no single doctrinaire approach to valuation of real property. Genola Ventures v. Shrewsbury, 2 N.J.Tax 541 (Tax Ct. 1981). In that case the court also said:
... An expert is not limited to the traditional approaches to value if his knowledge and experience, adequately supported, can be of assistance in regard to the critical issue of that price which hypothetical parties will use as an exchange for real property on the assessment date, [at 551, 552; citation omitted; emphasis supplied]
However, the witness failed to utilize “recognized appraisal concepts and techniques” to arrive at a “proper valuation of the property being appraised,” and what he did was not “adequately supported.”
The court rejects the value opinion given by the municipality’s expert. It is not credible, it does not involve proper appraisal methodology and it is useless in attempting to arrive at the value of the property which is the subject of this matter.
The judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. Wright v. Purepack Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. Ocean Cty. v. Landolfo, 132 N.J.Super. 523, 528 [334 A.2d 360] (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398 [189 A. 67] (E. & A. 1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174 [394 A.2d 390] (App.Div.1978), certif. den. 79 N.J. 483 [401 A.2d 239] (1979). [Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 42-43 (Tax Ct. 1980)]
Although the taxpayer’s witness emphasized the market approach, the court concludes that, because of the weaknesses in that approach, in this case the cost approach should predominate. The decision as to which valuation approach should predominate depends upon the facts of the particular matter and the reaction to these facts by the experts. New Brunswick v. N. J. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963). The cost approach is normally relied upon to value unique structures for which there is no market. Dworman v. *62 Tinton Falls, 1 N.J.Tax 445 (Tax Ct. 1980); Jersey City v. Martin, 20 NJ.Misc. 283, 292, 26 A.2d 733 (St. Bd. of Tax App. 1942). However, the testimony and evidence on the cost approach adduced on behalf of the taxpayer cannot be accepted in its entirety. The primary weakness in the taxpayer’s expert’s cost approach is depreciation of 65%. His market study indicated a range of total accrued depreciation of 43% to 69%. After allowing for physical depreciation to each of the comparable properties, the amount of functional and economic obsolescence ranged from 39% to 55%. By analyzing the causes of functional and economic obsolescence in the comparable properties and in the subject, the witness concluded there should be 55% combined functional and economic obsolescence. However, based on a consideration of the uses to which the subject may be put and a review of the comparable properties used by the witness to determine functional and economic obsolescence, the court finds that the lowest amount in the range, 39%, is the proper amount to be used. To that is to be added 10% physical depreciation used by the witness. A summary of the cost approach is:
Reconstruction cost new $ 6,264,694
Less total accrued depreciation (49%) 3,069,700
Depreciated reproduction cost 3,194,994
Land value 850,000
Total $ 4,044,994
Rounded $ 4,045,000
The value as of October 1, 1978 for the tax year 1979 is $4,045,000. In view of the record before the court, the court is constrained to find the same value as of October 1, 1979 for the tax year 1980.
For 1980 the issue of discrimination is before the court. The parties stipulated that 85%, the chapter 1232 ratio for 1980, should be applied to the value found. The total assessment for 1980 is $3,439,000 rounded.
The Clerk of the Tax Court will enter judgments as follows:
*63 For 1979:
Land $ 850,000
Improvements 3.195,000
Total $ 4,045,000.
For 1980:
Land $ 723,000
Improvements 2,716,000
Total $ 3,439,000.

The assessments before the court do not involve farmland qualification and no evidence was presented on that issue. See discussion of testimony of municipality’s expert, infra.