RIMM, J.T.C.
These local property tax matters involve farmland assessments for tax years 1982 and 1983. The subject property is known and designated as Block 3500, Lot 1 on the Lacey Township tax map. For tax year 1982 the original assessment and judgment of the Ocean County Board of Taxation were as follows:
Original Assessment County Board Judgment
Land $ 2,869,000 $ 2,079,200
Improvements —0— —Q—
Total $ 2,869,000 $ 2,079,200
The taxpayer was dissatisfied with the county board judgment and filed a complaint with the Tax Court seeking a reduction in the assessment alleging the property qualified for farmland assessment under the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 et seq. (the act) as land devoted to the production of trees and forest products for sale. For tax year 1983 the original assessment was:
2.079.200 Land
-0-Improvements
2.079.200 Total
*567 The taxpayer also was dissatisfied with this assessment and filed a direct appeal under N.J.S.A. 54:3-21 with the Tax Court again alleging the property qualified for farmland assessment.
The subject property is a tract of vacant land consisting of 5,855 acres[1] extending in a general north-south direction from Lacey Road on the north to the Lacey Township-Ocean Township line on the south. Plaintiff also owns 401 acres on the north side of Lacey Road across from the subject property and approximately 1,000 acres in Ocean Township abutting the subject property. The 401-acre tract is designated as Block 2500, Lot 7A. The subject property is intersected by the bed of the former Tuckerton Railroad which runs in a general east-west direction across the property about one-third of the distance from Lacey Road to the township line. North of the railroad bed the property contains a gravel pit. South of the railroad bed there is “pine forestry,” according to plaintiffs property manager who was the first witness.
This witness testified that activities on the property included reforestation, tree cutting and pulp-wood farming. However, in fact only two things were done: one was the planting of thousands of Japanese black pine seedlings in the gravel pit area of the tract; the other was entering into contracts with a timber buyer with whom plaintiff had his first dealings concerning the subject property in 1973.
The witness testified that in 1980 a contract was entered into with the timber buyer under the terms of which the buyer paid $4,330 for the right to cut pine trees from the subject property and from Block 2500, Lot 7A. The contract contains the following wording:
ARTICLE IV. The Purchaser agrees to pay to the Owner the sum of $4,330.00 for all the trees included within the terms of this Contract, and that payment shall be made as follows: *568 $752.00 for 300 cords on twelve acres of Lot B-1 and $3,578.00 for 1,432 cords on one hundred acres of Lot B-2. The 1,732 cords to be taken by the Purchasers will constitute no more than 10% of the present existing trees on the twelve acres of Lot B-l, and the one hundred acres of Lot B-2, areas indicated on the attached map and outlined in blue.
The lot referred to as B-1 in the contract is Block 2500, Lot 7A. Lot B-2 is the subject property. Accordingly, the contract provided for the sale of wood for $3,578 from 100 acres of the subject property. Attached to the contract was a map detailing the 100-acre area of the subject property from which trees were to be cut. In 1980 plaintiff also planted 2,500 Japanese black pine seedlings in the gravel pit area of the property. For the year 1981 precisely the same contract was entered into between plaintiff and the buyer and the sum of $4,330 was paid to plaintiff. In 1981 2,000 Japanese black pine seedlings were planted on the property by plaintiffs employees. In 1982 the same contract was again entered into and $4,330 was paid to plaintiff. In that year another 2,000 seedlings were planted on the property. In 1983 once again the same contract was entered into and once again the sum of $4,330 was paid to plaintiff. In 1983 1,000 seedlings were ordered planted on the property but through inadvertence they were planted on an adjoining property owner’s land. The 1981, 1982 and 1983 contracts contain exactly the same ARTICLE IV. as the 1980 contract although different maps are attached to each contract. The map attached to the 1983 contract to indicate the area from which trees were to be cut by the buyer was based on a forestry management plan prepared for the subject property to obtain Pinelands Commission permission to cut trees from the tract. See generally Pinelands Protection Act, N.J.S.A. 13:18A-1 et seq.
On cross-examination the witness testified that he could not state whether trees cut by the buyer under the contracts were taken from the subject property or from plaintiff’s lot north of Lacey Road.
The timber buyer with whom the contracts were made was plaintiff’s other witness. He testified that he cut and removed oak and “pitch pine” from the subject property. He did not *569 follow the maps attached to the contracts because he could not get the number of cords of wood to which he was entitled if he followed the maps. The witness believed that he cut 1,400 or 1,500 cords of wood in 1980. He also said that in 1980 he cut 20 cords an acre from a “couple hundred acres.” His testimony was therefore inconsistent and essentially unreliable on the question of the amount of wood cut from the subject property and the size and location of the area from which wood was cut in 1980.
His testimony relating to 1981 was also vague and uncertain. Although there were references to yields per acre and number of acres cut, the court is unable to fix with any certainty the amount of wood taken from the subject property and the size and location of the area from which wood was cut in 1981. It is not even clear that wood was cut from the subject property in that year. It may all have been cut from the adjoining tract, Block 2500, Lot 7A.
In 1982 the buyer was stopped from cutting cord wood because of pinelands regulations, and he cut no cord wood in that year. He did cut 200 trees in 1982 to be used for pilings. This cutting took from two to four days, the total time he spent cutting wood on the subject property in 1982. The cutting took place only along trails on the property so that the pilings could be easily carried by the men from the property without heavy equipment. He received $2,000 for the pilings he cut in 1982. Although he paid plaintiff $4,330 for 1982 in accordance with his contract, he has not sought any refund.
As of the trial date he had cut no wood from the subject property in 1983. Again, although he paid plaintiff $4,330 in accordance with the contract for 1983, he has sought no refund. No cutting was done on the property in 1983 because of pinelands regulations which require a permit from the Pine-lands Commission for the cutting of wood. Application for the permit had been made by plaintiff in accordance with a forestry management plan submitted to the commission, but the permit had not been issued as of the trial date.
*570 Although prior to 1980 the witness submitted reports to plaintiff on wood cut from the subject property, no written verification of wood cut was submitted for 1980 or the years thereafter, and the witness had no records relating to the cutting of wood from the subject property after 1979.
This witness also described the subject property and the difficulty he encountered in his cutting operations by saying, “It’s a jungle in there.” Finally, he testified that the seedlings planted by plaintiff were not surviving.
Two witnesses testified on behalf of the municipality. The first was the township manager who was the assessor in 1982. He inspected the property on several occasions. He stated that he found no evidence of wood cutting to the extent described by the timber buyer. He did observe that individual trees of substantial size had been cut at random over the tract. He also described the area in which the seedlings had been planted. Marked in evidence during his testimony were eight photographs, four of which depicted the gravel pit area in which the seedlings were planted. His testimony and the pictures disclose no more activity, perhaps even less, than that rejected by the court in Princeton Research Lands, Inc. v. Upper Freehold Tp., 4 N.J. Tax 402 (Tax Ct.1982) as a basis for farmland assessment. This evidence confirmed the timber buyer’s testimony that the seedlings were not surviving.
The most devastating testimony to plaintiff’s cause came from the municipality’s expert witness. He is a widely known and recognized authority in the field of forestry management. A former head of the forestry school at Pennsylvania State University, he retired from that position in 1969.
He first inspected the subject property in 1977 and had inspected it two or three times since. His inspection in 1981 consisted of flying over the property, at which time he saw no extensive area of timber harvesting. His most recent inspection of the property was on August 24, 1983 when he went on the property with the township manager. Although he said he only inspected about 10 to 12% of the property, he did inspect *571 the areas around the two access roads described by the timber buyer as the means of ingress and egress to the property. He found no skid trails, no landing areas and no truck roads into the tract commensurate with the extensive wood cutting described by the timber buyer. He did say that the amount of wood described by the timber buyer as taken from the tract constituted a very substantial amount of wood which could not possibly have been taken from the subject property based on what he saw on the property. In addition, he described the tract as one which could only yield an average of two cords of wood an acre from trees which it would be profitable to cut and he did not even see evidence of such cutting.
He also inspected the planting area and said that, at the very most, only five to ten percent of the trees were surviving. He also stated that Japanese black pine was not the proper specie of tree to plant in the area of the subject property.
This state’s constitution provides for the favorable assessment of farmland but specifically restricts such special treatment to land “not less than 5 acres in area, which is ... actively devoted to agricultural or horticultural use____” N.J. Const. (1947), Art. VIII, § 1, par. 1(b). The act enumerates the requirements for land to qualify for such assessment.
N.J.S.A. 54:4-23.2 and -23.6 provide for assessment as farmland of land (1) not less than five acres in area (2) actively devoted to agricultural or horticultural use (3) for at least the two successive years immediately preceding the tax year in question and (4) for which land a timely application for farmland assessment has been submitted.[2] Land is deemed to be in agricultural use when devoted to the production for sale of, among other things, trees and forest products, N.J.S.A. 54:4-23.3, and woodland may qualify for farmland assessment treatment. Urban Farms, Inc. v. Wayne Tp., 159 N.J.Super. 61, 386 A.2d 1357 (App.Div.1978). Finally, N.J.S.A. 54:4-23.5 provides that woodland more than five acres in area is deemed *572 actively devoted to agricultural use when the gross sales of the tree products produced “thereon”(emphasis supplied) averaged at least $500 a year from five' acres of land and $0.50 a year from each additional acre of “the area above five acres” (emphasis supplied) or when there is “clear evidence” of anticipated yearly gross sales of at least $500 from five acres of land and $0.50 from each additional acre.
The income requirement of N.J.S.A. 54:4-23.5 in this case is $3,425 for the entire tract of 5,855 acres.[3] For years 1980 and 1981 plaintiff received $4,330 a year, of which $3,578 was allocated to the subject property, from a timber buyer who was authorized to go upon the subject property and cut trees. The contracts authorizing the timber buyer to cut wood for a fixed amount of money satisfy the income requirements, but they do not satisfy all the statutory requirements to qualify the land for farmland assessment. The act clearly requires that the income come from the sale of products from the land. Gottdiener v. Roxbury Tp., 2 N.J.Tax 206 (Tax Ct.1981); Checchio v. Scotch Plains Tp., 2 N.J.Tax 450 (Tax Ct.1981). N.J.S.A. 54:4-23.5 which provides that land is deemed devoted to agricultural or horticultural use if certain income requirements are met, speaks in terms of income from “products produced” on land “five acres in area” and “products produced on the area above five acres.”
 The plaintiff has the burden of proving that the income resulted from “products produced” on the land and what “area” was involved. Franklin Estates, Inc. v. Edison Tp., 142 N.J.Super. 179, 361 A.2d 53 (App.Div.1976), aff’d per curiam 73 N.J. 462, 375 A.2d 658 (1977). The mere haphazard use of land resulting in sufficient income to meet the income requirements of the act does not necessarily qualify the land for such assessment. Gottdiener v. Roxbury Tp., supra. In a case involving woodland the equivalent of an “ongoing hus *573 bandry operation” in Gottdiener would be a silviculture program as described in Urban Farms, Inc. v. Wayne Tp., supra. While a formal written plan by a third party for such a program may not be necessary to satisfy the statute’s requirement of production for sale of trees and wood products, mere intent is not enough. Spiotta Bros. v. Mine Hill Tp., 1 N.J.Tax 42 (Tax Ct.1980).
This court cannot determine the number of acres from which wood was cut or the location of such acres. Green Pond Corp. v. Rockaway Tp., 2 N.J.Tax 273 (Tax Ct.1981), aff’d 4 N.J.Tax 534 (App.Div.1982).[4] This court cannot arbitrarily determine that a given number of acres qualifies for farmland assessment merely because the income requirements for that number of acres have been met. The fact that 100 acres of the subject lot are referred to in the contracts does not, of itself, qualify even that number of acres. Although there was evidence of income, there was no evidence of even the most elemental activities which might constitute the production of wood products on woodland, such as the clearing of survey lines, the clearing of access roads, the adoption and implementation of a burning plan to lessen the threat of forest fires, the adoption of an insect control plan and the removal of dead, dying, diseased and deformed trees. These activities among others, define and locate an area devoted to the production for sale of wood and wood products. For example, the failure to clear survey lines no doubt made it impossible to distinguish the subject property from that owned by others.
While land, five acres in area, is deemed actively devoted to agricultural or horticultural use when certain income requirements have been met or when there is certain anticipated income, this court, like the Green Pond Corp. court, is unable to determine whether wood cut in accordance with the contracts *574 between plaintiff and the timber buyer since 1980 came from “an area one acre in size, five acres in size, or if it was taken from random areas throughout the woodland. The possibility even exists that it came from some part of [plaintiffs] land outside” the subject property. Green Pond Corp., supra at 286. Just as the entire planting for the year 1983 was done on adjoining property, the cutting of trees in this matter, or at least some of the cutting, also may have been done on property other than the subject property. Accordingly, the subject property does' not qualify for farmland assessment for the tax year 1982.
The same analysis is essentially true for the years 1981 and 1982 for purposes of determining the subject’s eligibility for farmland assessment for tax year 1983. In addition, a total of not more than four days for the entire year was spent on the land by the timber buyer in 1982. Trees that were cut on those days were cut along trails with easy access to roads. It is impossible to determine the acreage from which trees were taken during those days. Accordingly, the subject property does not qualify for farmland assessment for the tax year 1983 either.
There is also no evidence before the court of anticipated yearly gross sales amounting to at least $500 within a reasonable time. One reason for this is the pinelands regulations affecting the property. Plaintiff has failed to show when, if at all, there will be compliance with the pinelands regulations so as to permit the sale of wood and wood products from the subject property. The planting of the seedlings also does not indicate that there will be gross sales within a reasonable period of time. There is no evidence of the amount of anticipated sales, if any. More important, however, is that there will be no development of a timber crop from seedlings to mature trees ready for cutting in this matter. Cf. Green Pond Corp. v. Rockaway Tp., supra. The mere planting of seedlings is not “the production for sale” of trees and forest products. The seedlings were not cared for and as a consequence 90% to 95% of the seedlings died. Furthermore, the uncontradicted expert *575 testimony before the court is that Japanese black pine seedlings, planted by plaintiff, were not the right specie of tree to plant on the land. The planting of the seedlings did not constitute reforestation and was nothing more than a thinly disguised and ineffective attempt to qualify the property for farmland assessment. This attempt to qualify the land for farmland assessment can be no more successful than was the attempt made by the property owner in Princeton Research Lands, Inc. v. Upper Freehold Tp., supra, in which the court said:
The mere planting of trees to be sold at some undetermined future time without requisite care given to the trees to bring them to market is not the production of crops for sale. The fortuitous survival of some of the trees, evident from the taxpayer’s expert’s testimony on unusual mortality among the trees, does not constitute active devotion to agriculture or horticulture. To find otherwise would be to defeat the purpose of the policy of farmland assessment, not to encourage such a policy. [4 N.J.Tax at 411]
The complaints are dismissed for tax years 1982 and 1983, and the Clerk of the Tax Court will enter judgments accordingly.

The tax bill attached to the complaint for tax year 1983 indicates that the tract consists of 5,940.45 acres. The difference is not material to a resolution of the issues before the court.

The filing of a timely application is not in dispute in this matter.

$500 for the first 5 acres and $0.50 an acre for the additional 5,850 acres equals $3,425.

The Appellate Division actually dismissed part of the appeal and affirmed the remainder of the judgment on the opinion below. The net effect is an affirmance.