RIMM, J.T.C.
This local property tax matter involves valuation and discrimination for the tax year 1983. The subject property is designated as Block 233, Lot 1 on the tax map of defendant municipality and contains 13.45 acres. The lot is improved with a one-story, brick and block-over-steel frame industrial building, used by plaintiff for warehouse, distribution, office, vehicle storage and vehicle repair services. The building was built in 1948. According to defendant it contains 41,736 square feet. There are 5,000 square feet of office space in the building. For the tax year 1983 the assessment was:
Land $ 336,300
Improvements 297,700
Total $ 634,000
On appeal by taxpayer to the Monmouth County Board of Taxation a judgment was entered sustaining the assessment. The taxpayer then filed a complaint in the Tax Court seeking a reduction in the assessment.
In valuing the subject property, plaintiffs appraiser used all three conventional approaches to value. It was his opinion that, by the cost approach, the property had a value of $1,099,-400; by the income approach, a value of $1,134,500, and by the market data approach, a value of $970,000. His final opinion of value was that indicated by the market data approach, $970,000. Plaintiff’s expert testified that he relied mainly on the market *172 approach to value because there is “an abundance of comparable industrial sales in the area.”
The witness first testified about the cost approach to valuing the subject property. More will be said about this approach hereafter when the improvements are more fully described.
The witness next testified about the income approach. His income approach is rejected for the reason that he was completely unable to support the comparable rentals he used in arriving at economic rent for the subject property. The witness testified to four properties which he said were comparable to the subject property. He testified as to the square foot rent of each of the comparable properties. The rentals were net, but the witness acknowledged that he never looked at the leases and did not discuss with any one involved with any of the rentals what constituted the definition of “net lease.” He was unable to say what payments the tenant made and what expenses the owner paid, and he was otherwise unable to give any of the details of the landlord-tenant relationship on the basis of which a meaningful net rent could be determined for the subject property.
In this regard the comments on lease types in American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) must be noted:
Although a lease may be drawn to fit any situation, most leases fall into one of several classifications. Leases can be broadly classified as flat rental, graduated rental, revaluation, index and percentage. Within such classifications, a lease may be on either a gross rental basis, with the lessor paying all operating expenses for the real estate, or a net rental basis, with the tenant paying all such expenses. A lease frequently reflects terms that fall between these extremes, with a specified division of expenses. [Id. at 353]
From this, it is obvious that, without review of a lease, an appraiser is unable to tell precisely what the tenant’s responsibility is and what the owner’s responsibility is. He cannot realistically say whether a given rental payment is the total obligation, in terms of rental expense, which the tenant undertakes.
*173 In arriving at his value for the subject property, the witness provided for owner-incurred expenses of management/brokerage fees and structural repairs only. There is no testimony before the court as to whether the owners of the four comparable properties incurred any other expenses. Nor could any such evidence be presented to the court by this witness who never reviewed the leases utilized to establish net rentals.
Parenthetically, aside from his inability to support his conclusion of economic rent, his capitalization rate is completely without any support in the record, and the income approach is rejected on that basis as well.
The market data approach is also rejected. The witness was of the opinion that the property had a value of $970,000 by this approach. In arriving at this opinion the witness used seven comparable sales. He determined a square foot unit price for each comparable sale property. He then adjusted each such price to determine an adjusted unit value, adjusting the unit price to a value for the subject property. Based on this work, the witness was of the opinion that the indicated unit value of the subject property was $16 a square foot for land and building, merged. The land included in this value was 4.5 acres. The witness also valued the excess land, or approximately 8.75 acres, at $35,000 an acre and determined a total value of $970,000, rounded.
At the conclusion of the witness’ testimony on the market data approach, plaintiff rested. Coincidentally with the plaintiff’s resting its case, the trial was adjourned at the end of the first trial day, with defendant to have cross examination on the following day. When court convened on the second trial day, however, plaintiff sought leave of court to produce further direct testimony, particularly with regard to the market data approach. Such leave was granted to plaintiff, and plaintiff’s expert witness proceeded to testify at some length that he had erred in his market data approach and that the error was in the information relating to his comparable sale number three. He had testified on the previous day that the property involved in *174 comparable sale number three had 10,220 square feet. He now testified that that was an error and that in fact the property had 27,500 square feet. In addition, as a result of cross examination, and questions by the court, it appeared that the witness had improperly described the physical condition of the property involved as comparable sale number seven. His testimony on direct examination was that the property was in good condition. In fact, at the time of the sale on the basis of which the witness determined a unit price and hence an adjusted unit value, the property was in poor condition. When confronted with this fact from his own testimony on cross examination, the witness conceded that the age and condition adjustment he had made for sale number seven of minus 5% was in error. He testified that, upon reflection, the correct adjustment should have been plus 10%. Nevertheless, he also testified that the swing of 15% in the adjustments for age and condition of sale number seven made no difference as to the adjusted unit value of $14.50 for comparable sale number seven.
The witness also testified that, notwithstanding the corrections in his testimony relating to comparable sale number three and comparable sale number seven, his opinion of value remained precisely the same, namely $970,000. Such an opinion is not believable, and the witness' opinion of value based on the market data approach is rejected.
The witness also used the cost approach in arriving at a value for the subject property. He first used four comparable land sales from which he concluded that the subject property had a value of $35,000 an acre for both the land necessary for the building and the excess acreage, drawing no distinction in value between these two areas.
The witness measured the cost of the improvements by using Marshall and Swift’s Marshall Valuation Service and R.S. Mean’s Building Construction Cost Data on the basis of which he arrived at a final square foot cost for the improvements of $31.75, including a sprinkler system and air-conditioning. He then adjusted the cost by depreciating it by 55% for *175 physical depreciation only based on a 34-year effective age. He testified that he concluded to use 55% for depreciation based on the cost manual he used in arriving at a cost per square foot. He also included $38,400 for yard improvements, depreciated. His final value as indicated by the cost approach was $1,099,-400, for both the land and improvements. Accordingly, plaintiff’s opinion of value was $1,099,400.
Defendant’s valuation expert eschewed the market data approach, indicating that he found no comparable sales. He said that, in arriving at his opinion of value, he used the economic, or income, approach, and the replacement, or cost, approach to value. It was this witness’ opinion that, by the cost approach, the subject property had a value of $1,361,500. By the income approach, it was the witness’ opinion that the subject property had a value of $1,356,900, which was the witness’ final opinion of value after his indication that he relied primarily on the income approach.
In his income approach to value, defendant’s expert witness used a net economic rent of $4.50 a square foot of building. From this he deducted approximately 10x/2% for management, reserves for replacements and structural repairs to indicate $4.03 a square foot rent or $168,000 net operating income to be capitalized for a value determination.
It was the witness’ opinion that “[cjonceivably an automobile dealership might be an alternate use for this property given the on-site open air storage as well as the maintenance facilities for trucks.” The witness also said “that the closest type of property to the subject would have to be an automobile dealership, containing an inside automotive repair facility similar to the truck repairs used in the subject.” Accordingly, the witness presented evidence that “[t]he chief support for the rental value would be the lease from Yegan, Frye, Murphy and Kernoff to Rittenhouse Lincoln/Mercury of Block 141, Lot 5A located ... ½ mile north of the subject____ The annual lease, net to the freeholder, (the tenant was required to pay for real estate taxes as well as insurance) is $71,600 equivalent to $3.98 per *176 square foot for the 18,000 square foot structure as of the 1972 time period.”[1] No other evidence of rental value was presented.
There is no explanation of how the witness adjusted the rental of $3.98 a square foot in 1972 to $4.50 a square foot as of October 1, 1982, the critical assessing date for the tax year 1983. Even if one assumes that rentals increased between 1972 and 1982, there is absolutely no basis in the facts before the court nor in any appraisal theory which would permit a ten-year-old rental to be the basis for a determination of current economic rent. Defendant’s income approach to value is therefore rejected.
There remains for review the cost approach. Although it is not a favored valuation method for a building 34 years old, both experts did use it, and I conclude that in this case the cost approach should predominate. The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 189 A.2d 702 (1963). The Tax Court has indicated that the cost approach may predominate if the proofs submitted in support of that approach are more reliable than those submitted in support of any other approach. ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J.Tax 244 (Tax Ct.1980); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982).
A review of each witness’ cost approach indicates the following:
plaintiff Defendant[2]
Size of building in
square feet 41,292 41,736
Cost a square foot $ 31.75 $ 29.89
*177 Plaintiff Defendant
Replacement cost $ 1,311,100 $ 1,247,427
Physical depreciation 55% 20%
Functional obsolescence 0% 20%
Amount of depreciation and obsolescence $ 721,000 $ 498,927
Value of building $ 590,100 $ 748,500
Methodology Marshall and Swift and R.S. Mean New Jersey Assessors Real Property Appraisal Manual (1955 edition)
Total acres of land 13.45 13.45
Land value, an acre $ 35,000 $ 40,000
Total land value $ 471,000 $ 538,000
Site improvements $ 38,400 $ 75,000
Total value $ 1,099,400 $ 1,361,500.
Based on the evidence presented by both parties, I conclude that the value of the subject property by the cost approach is $1,209,300 determined as follows:
Size of building in square feet 41,736
Cost a square foot $ 31.75
Replacement Cost $ 1,325,118
Physical depreciation 55%
Functional obsolescence 0%
Amount of depreciation and obsolescence $ 728,814.90
Value of building $ 596,308.10
Total acres of land 13.45
Land value an acre $ 40,000
Total land value $ 538,000
Site improvements $ 75,000
Total value, rounded $ 1,209,300.
*178 In reaching this conclusion, I note that
[t]he judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are offered as the foundation of his opinion. Ocean Cty. v. Landolfo, 132 N.J.Super. 523, 528 [334 A.2d 360] (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398 [189 A. 67 (E. & A. 1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174 [394 A.2d 390] (App.Div.1978), certif. den. 79 N.J. 483 [401 A.2d 239] (1979). [Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 42-43 (Tax Ct.1980)]
I accept the municipality’s square footage of the building, value of site improvements and land value as adequately supported in the record. Of course, the municipality cannot quarrel with my acceptance of plaintiff’s opinion of replacement cost since it exceeds its own expert’s opinion of that cost.[3]
A significant dispute between the parties in the cost approach relates to physical depreciation and functional obsolescence. In this regard I am constrained to accept the opinion of plaintiff’s expert based on references to the cost manuals which he used.
It is true that “[n]o nationally standardized table or chart, however derived, can effectively replace an appraiser’s justification of accrued depreciation in a particular property based upon market data, observation, experience and explicable analysis and calculation.” WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 629 (Tax Ct.1985). It could also be argued that such a large allowance for depreciation effectively vitiates any determination of value by the cost approach. In the present case, however, both the appraisal admitted in evidence and the testimony of plaintiff’s witness indicate an inspection and analy *179 sis which support his determination. It is also important to note that this expert’s work with the cost approach differed markedly from his work with the market data and income approaches. Plaintiff’s expert’s observation of the building itself and its component parts was apparently quite carefully done.
As indicated, in determining the cost of the improvements, the appraiser used nationally accepted pricing manuals in connection with current cost pricing methods developed by the engineering staff of the appraisal company with which the witness is associated. The building was extensively described in the evidence submitted on behalf of plaintiff as a one-story masonry industrial structure utilized for warehousing and distribution. The actual age of the building as of the appraisal date was 34 years, and the witness was of the opinion that that was also the effective age. Of the total number of square feet of gross building area, approximately 5000 square feet is finished, air-conditioned office space. The condition of the building was described as average, and the building class and quality were class C-average. Construction details indicated concrete foundations, structural steel framing, brick and block exterior walls, a flat, built-up composition type roof over a metal deck, concrete floors, ceiling heights ranging from 15 feet to 23 feet clear span, predominantly 23 feet, with column spacing of approximately 20 feet by 50 feet. The description of the mechanical details indicated heating, ventilating and air-conditioning consisted of oil- and gas-fired, ceiling mounted space heaters in the warehouse and gas, hot air heating in the office areas. Electrical current was supplied to the building by three-phase, four-wire standard industrial power, considered sufficient to meet current utilization. Plumbing included a full sprinkler system and men’s and women’s washroom facilities in the plant and office area portions of the building. The plant area of the building had concrete floors, either exposed block or brick walls and several small partitioned offices. The ceiling is primarily an exposed concrete and steel truss ceiling. Suspended fluorescent fixtures are located throughout the plant area. *180 The office areas were completed with suspended acoustical tile ceilings, recess fluorescent lighting, some exposed painted concrete floors and some typical office carpeting. The walls are either painted plaster, dry wall or paneled. There are seven wood, overhead, drive-in doors and two concrete, depressed loading docks at tailgate height. There are also truck repair and maintenance facilities, locker rooms, showers and pass through access for trucks into the building.
Defendant’s witness, on the other hand, completely failed to support his opinion of depreciation and obsolescence. He said his use of 20% for functional obsolesence was “a guess” based primarily on the fact that an “old syrup room” 20 feet by 20 feet was no longer used. His use of 20% for physical depreciation was, based on the evidence before me, no more than another guess.
Since the value of the subject property has been found to be $1,209,300 as of the critical assessing date, reference must be had to chapter 123[4] to determine what the correct assessment is for the tax year 1983. For that year the chapter 123 ratio for defendant municipality was 45%. The lower limit of the common level range was 38%, and the upper limit of the common level range was 52%. The ratio of the assessed value to the true value of the subject property is 52.43% (R = CA/TV or R = $634,000/$l,209,300). Since this ratio exceeds the upper limit of the common level range, the assessment must be reduced to an amount equal to the true value multiplied by the chapter 123 ratio, or $544,200 rounded ($1,209,300 x 45%). For administrative purposes the assessment will be allocated between land and improvements in the same proportion as the original assessment. Accordingly, the Clerk of the Tax Court will enter judgment in this matter that the property is assessed for the tax year 1983 as follows:
*181 Land $ 288,700
Improvements 255,500
$ 544,200. Total

 The property was sold to the tenant in 1978 so that no other lease information was available.

 The amounts are as set forth in the appraisal admitted in evidence.

 If plaintiffs cost figures were calculated on the basis of defendant's square footage, the difference would be $.03 a square foot.

 N.J.S.A. 54:1-35a et seq.; N.J.S.A. 54:51A-6.